Ruffin, C. J.
 

 The Court has carefully considered the instructions given by his Honor to the Jury, and' does not perceive any error in them to the prejudice of the prisoner. It was argued at the bar, that it was a case of sudden affray, or mutual combat in the heat of blood; and that the Court ought to have directed the Jury, that if the prisoner touched the deceased with the whip as an invitation to him to draw his pistol, and they immediately proceeded to the mortal affray, with pistols on each side, the killing was not murder. But a Court is not bound to lay down to the Jury, propositions merely abstract, however correct they may be in point of law. It is enough to inform the Jury upon such questions as the evidence raises, and not trouble them with those upon which there is no evidence. In this case, it is suílici-. ently obvious, that the position taken in the argument had no application. When an invitation to May to draw his pistol is spoken of, it must mean, that he was to draw for the purpose of a fight with .those weapons on both sides, and, moreover, for a fair fight with them'. Now there was no evidence of the state of facts supposed. But several circumstances shew in the mind of the prisoner a different purpose: These were the previous ill-will or angry feeling, as the
 
 *116
 
 Judge called it; the communication to the prisoner, by his own witness, at the election, that May was armed to repel an attack expected from him, and, his reply, that
 
 that
 
 was 110 P*aGe f°r *-he attack; then, the following the deceased by Martin and Waddill, the stopping him, and commencing an immediate'quarrel with him by both, the assault on him by Waddill with a pistol; and, finally, the assault on him with the whip and the shooting by the prisoner as soon or immediately after May drew his pistol, without having said one word of having a pistol himself, or otherwise proposing a combat of that kind. There was no warning from the prisoner; nothing like “prepare yourself,” or “are you ready.” So far, therefore, from these being evidence of a challenge to fight on an equal footing, these facts if believed by the Jury, afford a rational inference, that the prisoner had no such intention, but designed, upon the exhibition of an attempt, on the part of the deceased, to resent in that way the indignity of a stroke with a whip, to shoot him before he, the prisoner, could possibly be hurt. Upon that supposition, ■the killing would be undoubtedly murder. Being secretly prepared to kill, and intending to do so instantly in case he should perceive danger in the appearance of the other party, it is apparentthat he sought the other’s blood without meaning to be really exposed himself. In such a case, it is not material that the purpose of the prisoner was inspired by ■high words between him and the deceased. They furnish no mitigation for the killing an unarmed man, or an armed one taken designedly at a disadvantage. For the law is,
 
 ■“
 
 that in the case of mutual combat, in order to save the party making the first assault upon an insufficient legal provocation, from the guilt of murder, the occasion must not only be sudden, but the party assaulted must be put on an equal footing in point of defence, at least at the outset.” East. P. 0. 242. Admitting, then, this to have been a sudden mutual combat, it yet remained to ascertain, as matters ,of fact, whether the parties fought fairly, and whether the prisoner allowed the deceased to get on an equal footing with himself, or whether it was or was not his purpose,
 
 *117
 
 from the beginning, that the deceased should not have an equal chance.
 

 Those enquiries naturally arose out of the evidence: and they were left to the Juryfwith instructions, which could not have been misunderstood. In substance, they were : That if the prisoner, when he madethe assault with the whip, did not intend to shoot May, and his shooting was in consequence of the other party, contrary to the prisoner’s expectation, resorting to the use of a deadly weapon ; then the killing was not murder. But if the prisoner expected, in case he struck with the whip, that May would endeavor to return the assault by shooting him, and, nevertheless, the prisoner determined to make the attack, and made up his mind, if the other attempted to draw his weapon, to kill him as soon as he could; that, tlien, the killing with such a mind was murder. That such was the meaning of the presiding Judge, we think, is apparent, when the whole charge is considered.
 

 The case wasgsubmitted to the Jury under several aspects.
 

 It was first'isupposed the Jury might be of opinion, that before the prisoner rode up, and, consequently, before any words and without any immediate provocation, the prisoner “had determined to horse whip the deceased, and kill him if he resisted ; and for that purpose stopped him, had words with him, and touched him with the whip, expecting him to draw a pistol, and intending to shoot him if he did” — it would be a case of preconceived malice, and be murder. To so much of the charge, there can be no exception. For, to follow a person, and seek a combat with him, for the purpose of killing him, and covering the act with the pretence of a dangerous resistance to a moderate assault, is nothing less than wreaking a diabolical vengeance.
 

 A second hypothesis was, that the determination to horsewhip might not have been formed before-hand, but was formed just before the prisoner dismounted for the purpose oí inflicting it — when he said “I have a mind to horse-whip you.” In that case, the attention of the Jury was directed to two enquiries as material
 
 to the
 
 degree of the offence. First; they were told to ascertain, whether
 
 this
 
 determination was the effect of the quarrel that then took place, and not of pre
 
 *118
 
 vious angry feeling ; and if they should so find, and be also of opinion, that May’s return to the first assault was not expected by the prisoner ; that, then, from the nature of May’s res*stance> an^ tbe danger arising therefrom to the prisoner’s life, the killing would be extenuated to self-defence or manslaughter, according to certain circumstances mentioned. But they were told, secondly, that if this determination was
 
 not
 
 the effect of a quarrel that then took place, in other words, was not in fact provoked by the deceased at that time, but was the effect of previous angry feeling, inflamed by the words of Waddill — incited, that'is to say, by the prisoner’s own associate; and the Jury should find that the prisoner expected May to draw a pistol, if he struck him, and had made up his mind to shoot him if he did; and, accordingly, that the prisoner did shoot immediately upon the weapon being drawn — then it was murder. And, as we conceive, this instruction i's law, for two reasons. The killing would be murder, without regard to the want of equality of the parties in the combat, upon the ground that it
 
 was upon
 
 previous ill-will, or, at all events, without recent provocation from the deceased. For the instruction supposes the assault to be found by the Jury not to have been caused by the quarrel at the time ; and, consequently, it is not a case of sudden heat of blood or provocation, but of pre-existing ill-will, wrought up to the pitch of taking life by the opportunity to do so, and the advice of a comrade, who likewise cherished bad feelings towards the person attacked. But, besides, it would be murder for the reason on which his Honor submitted the case to the Jury; that is to say the undue advantage sought and taken by the prisoner. The case was distinctly, we think, put to the Jury in that point of view. For it is to be observed, that the Jury was directed to consider, whether Martin did not expect May “ to draw” a pistol, and “made up his mind to kill him if he didwhich is saying, that he intended to kill him, if he drew, and as soon as he drew — without allowing May time for full preparation, if he could prevent it. That the Jury must have received the instruction in that sense is deducible from the terms in which it was expressed; but it is placed beyond doubt by the language used in clos
 
 *119
 
 ing the charge. It is
 
 “
 
 that- whether there was a sudden quarrel which caused the fight, or whether it was the result oí a previous determination, or oí previous angry feeling, inflamed by the words of Waddill, and
 
 whether Martin waited until May was ready,
 
 or whether he did not approach,, intending to touch May with the whip, to see if he would take a whipping,
 
 and intended, if he attempted to draw his weapon, to take all advantages and shoot as soon as he could, and whether he did not, accordingly, do so,
 
 were left as questions of fact to them,” the Jury. Now, although one may not intend to kill another, if he will stand and take a whipping, yet if he be prepared with a weapon, and determined in his mind to kill him if he did not submit, but offers or attempts to resist by drawing a pistol; and with that resolution formed, and expecting such an attempt at resistance, he makes the assault, without more provocation, intending to kill before the other party can do more than
 
 attempt
 
 to draw; if death ensue, it must be murder. The assault was not designed to be, nor was it in fact., an invitation to fight with pistols; but it was a provocation by one party to the other to draw a pistol, with the intention to kill him if he made the attempt; and this without any notice of a purpose on his own part to use a deadly weapon. The suddenness of the purpose to kill, in such a case, does not extenuate the offence, more than a sudden determination to slay an unoffending man, accidentally met in the street. The attack is found not to have been made on cotemporaneous provocation. And, besides, if it had been, from the manner of it, it was rather an assassination, than a mutual combat in a fair field.
 

 Although the other grounds of exception stated in the record were not spoken to at the bar, yet in a case of such magnitude to the prisoner'it seems proper to notice them.
 

 The first is, that the verdict is contrary to law and evidence. If it be so, the Court cannot help the prisoner. We can correct the errors of the Judge, but not .those of the Jury, unless they may have been produced by the Judge.
 

 The position, that the State is bound to examine all the persons who were present at the perpetration of the fact, or to examine on the trial all witnesses who had been sent to
 
 *120
 
 the Grand Jury, has neither principle nor practice in this State to support it. The persons present are not the witnesses of the law, like persons who have attested a will. It *11 discretion °i ^ie prosecuting officer, as of any private suitor, what witnesses he will 'call. He examines such as he deems requisite to the execution of the public justice. If others can shed more light on the controversy, or place it in a new point of view, it is competent to the prisoner to call them. Without considering, therefore, the peculiar reasons on which the particular persons were dispensed with on this trial, and notwithstanding a modern case in England, we think the ruling of his Honor right, on the broad ground that it was the province of the Solicitor, and not of the Court, to determine who should be the State’s witnesses.
 

 The objection to the Grand Juror comes too late after the plea to the felony.
 
 Seaborn’s
 
 case, 4 Dev. 305.
 

 The opinion of the Court, therefore, is, that the prisoner is not entitled to a
 
 venire de novo.
 

 But the counsel for the prisoner has taken numerous objections to the record, and insists that the judgment should have been arrested, and must now be reversed.
 

 Upon the transcript filed by the prisoner, the indictment appeared to be defective, for the want of charging the giving of the mortal wound by the bullet shot from the pistol. The Attorney-General suggested the omission to be in making the copy, and obtained a
 
 certiorari
 
 for a fuller transcript. Upon that the clerk sent up a second transcript, in which the defect has been supplied, and the indictment seems to be perfect. But it is objected, that the Court
 
 cannot
 
 receive the second transcript, because the writ of
 
 certiorari
 
 is not annexed to it, and no return is endorsed on the writ or made to the Court, so as to make it appear that this transcript is sent in obedience to the writ. The clerk sent back the writ with the tianscript, enclosed together in a sealed letter, addressed to the clerk of this Court, in these words “Pursuant to your writ, I have made out another transcript of record in the case of the State against Martin, which is herein handed you.”
 

 As the return was not entirely formal, and we always deem it best to follow settled precedents, we did not choose
 
 *121
 

 to
 
 determine, whether that return would do when it was so easy to have one undoubtedly regular. The'writ and transcript were, therefore, returned to the clerk ; and he has sent them back, attached together by wafers, and with the follow-mg return on the writ:
 

 “ State of North Carolina,-
 

 Richmond County and Superior Court of Law.
 

 The execution of this writ appears in a certain schedule hereunto annexed, in witness whereof, &c.” the usual attestation following, under the hand of the clerk and' the seal of the Court, both to the return and the transcript. The objection is thus removed ; and we should not have felt called on to notice it, had we not observed that nearly all the clerks-seem alike uninformed upon this subject,- and hence- we suppose they may profit by this as a precedent.
 

 Upon the reception of the second transcript several objections were taken to it, which will now be mentioned and disposed of.
 

 The indictment was preferred in the Superior Court of Anson against three persons, Edmund Martin, as the’perpetrator of the murder, and- Thomas Waddill and William Gate-" wood as accomplices, present at the fact, aiding and abetting. The trial of Martin and Waddill was removed to' Richmond Court; and from that Court this appeal was taken to this Court. The transcript of the record from Anson is set forth in the transcript from Richmond, and states, that “ at a Superior Court of Law,
 
 begun and held
 
 for, &c. at, &c. on the' second Monday in September, in the year, &c. before the" honorable Justice J. W., the Sheriff
 
 returned
 
 the
 
 venire fa-cias,
 
 <fcc.” from which a Grand Jury is empannelled. It then proceeds: “ A bill of indictment, in the following words and-figures,
 
 was
 
 preferred” before the Grand Jury, that is to say, &c.; which
 
 was
 
 returned into Court by the said Grand Jury “ a true bill.”
 

 The transcript afterwards proceeds thus: “ Wednesday . September the 15th, 1841, the Court met pursuant to adjournment,” and it then sets out the arraignment of the three, and their plea of not guilty, and then the'affidavits of Martin and
 

 
 *122
 
 Waddill respectively, and orders thereon made that the trial should be removed, as to those two, to Richmond.
 

 Again the transcript proceeds : “ Tuesday, September 21, the Court met pursuant to adjournment,” and then sets forth a
 
 nolle prosequi
 
 by the Solicitor for. the State, as to Gatewood, and his discharge upon proclamation.
 

 The first exception to this record is, that it does not appear,
 
 when
 
 the indictment was found, nor that the arraignment and plea were in the same term, inasmuch as no adjournment is set forth, from the second Monday in September to Wednesday the 15th of September, which is the day of the prisoner’s plea, and
 
 the next time
 
 that is mentioned after Monday, on which the Court was opened.
 

 But, supposing for the present, that the use of the past tense is not fatal, we think the time of finding the indictment does appear, and that the exception is not sustainable in any respect. It appears by the reeord,. that the Court began on the day fixed by law, and was held by the proper person. No day is stated as that on which the indictment was presented, other than that on which the Court
 
 began;
 
 and therefore it follows, that it was in fact found on that day. The term of a Court is in legal contemplation as one day; and although it may be open many days,, al'l its acts refer to its commencement, with the particular exceptions in which the law may direct certain acts to be done on certain other days. It is seldom necessary that the day oí any proceeding should appear in making up the record, distinct from that of the beginning of each term, although a minute may be kept of each day’s doings. Nor is it necessary that there should be adjournments from day to day, after the term is once opened by the Judge; nor, if there should be, that they should be recorded, in order to preserve the authority of the Court to perform its functions. The Court may, in fact, not adjourn during the whole term, but be always open ; though, for the convenience of suitors, an hour of a particular day, or of the next day, may be given them for their attendance. If the record state the time of doing an act, as the statement is unnecessary, so it is harmless surplusage, unless the day be beyond the period to which the term legally extends. Take
 
 *123
 
 this record either way, then, and we think it well enough. If it import, that the Court did not adjourn because no adj ournment of the preceding day is set forth, then it is to be taken, that the Court was kept open, as it lawfully might be. If, on the other hand, the entry of the time — “ Wednesday, September 15th, 1841, the Court met, pursuant to adjournment” — imports that there had been an adjournment from a former day to the latter, there is no error, provided the latter day be not beyond the termfor the Court, although not bound to adjourn, may do so from one day to another within the term. Each day mentioned in this record is within the term; for the Fall Term of Anson Superior Court continues two weeks if the business requires it. Rev. Stat. c. 31, s. 16.
 

 The next point made is, that the order of removal was not warranted by law, because there were three indicted, and the trial of only two removed; so that the whole cause was not removed, as it ought to have been. If the prisoner could be allowed an exception against his own action, yet it seems sufficiently clear that there is no error in the point supposed. The record shows, that as to Gatewood, the third party, the prosecution was ended by a
 
 nolle 'prosequi,
 
 and therefore it pended only against the two, whose trial was removed. It is true, the order and entry of his discharge were made on a day subsequent to that of the order of removal. But every act of the Court, whenever made, has its efficacy from the first moment of the term; and during the whole term the record is in the breast of the Judge, and an order may be modified, or any new order made that may be requisite to give validity to one before passed. But we have no doubt that where two are indicted, the trial of one only may be removed. However it may be in cases of dependent guilt, or although it may be in the discretion of the Court to refuse a removal as to one, without all, yet in ordinary cases the Court undoubtedly has the power to allow such a removal. The charge is several; and the defendants may be tried separately in either Court. There is no reason, therefore, why there may not be a separate removal. In neither case is the record removed. It remains in the original Court, and the trial, whether of one or all in another countyis on a tran
 
 *124
 
 script. The removal does not change the mode of trial; but, for the purpose of impartial trial, it is sent to another county, in which jurors of unbiassed minds may be That may be nceessary as to one of the accused, and not the other; and therefore the Court ought to have this power. Such >ve know has been the practice. An instance is found in the reported case of the
 
 State
 
 v
 
 Lewis,
 
 3 Hawks 410. The facts of that case were, that the indictment was found in Wake against three two of whom removed their .trial to Franklin; and one of them again removed his trial •to Warren. The third was tried in Wake, and he and the ,one who went to Warren were both convicted and executed. The cases of
 
 Carter
 
 and
 
 Snow,
 
 and the
 
 State
 
 v
 
 Mills, 2
 
 Dev. 420, furnish other examples of this practice ; and of its propriety we entertain no doubt.
 

 Another exception is, that the past tense is used in several parts of the record: and so it is historical, and not a memorial .of the acts of the Court made as they occurred. It must be owned, that in strictness a record ought to be expressed in the present tense, because the acts of the Court are supposed to be recorded simultaneously with their adoption. We are, therefore, fully sensible of the philological .and legal propriety of the records speaking
 
 in presentí,
 
 and we are aware of
 
 Perrin’s
 
 case 3 Saund. 393, in which upon .a writ of error, the judgment was reversed, because in the award of the
 
 venire facias
 
 the record stated that “the sheriff
 
 was
 
 commanded,” instead of “is commanded.” Nevertheless we feel obliged not to reverse the judgment upon this ground. In this particular case, we see that although the pr.eter-perfe,ct tense is used, yet that the words
 
 cannot
 
 relate to any period antecedent to the time of inserting them in the record; and therefore they must be taken in the sense of the present tense. There was no continuance; but the case arose and was disposed of in Anson Court, all in a single term. That term is one day or the same as one day; and in respect ■to any thing during it there is, therefore, no prior or poster rior time. But the Court is not disposed to put the decision on that peculiarity, since we know the question must arise in cases in which there were continuances, and therefore, it
 
 *125
 
 ought to be put on some general ground at once. We have, therefore, to state, that we conceive ourselves bound by the most imperative considerations not to give to this grammatical inaccuracy the effect demanded. Were we inclined to an opposite opinion, we should be compelled to adopt the one we have, by numerous, we may say innumerable, precedents, and by a proper regard for the public security. Every one knows the defective professional skill of nearly all thp: clerks of our multiplied Courts, and that the evil is constanily on the increase; and must be sensible, that if such an objection were sustained, crimes would go altogether unpunished, and would have gone so for many years past. Indeed, this is the common form among us. We scarcely recollect a record coming to us, in some part of which the past tense did not occur. Many judgments of death have been affirmed in this Court on such transcripts; and it is too late to listen to the objection. Lewis’ case, already mentioned, furnishes an example to our purpose. After the usual commencement, the record proceeds, “A bill of indictment
 
 was
 
 found &c.” All the considerations which long usage can furnish, and all the force which multiplied judicial precedents, hitherto unquestioned, can possess, unite to impose on us at this day the obligation not to allow this impediment to the course of justice. In reality, however, there can be no hesitation as to the sense of the record. It purports to be a relation by a tribunal of its acts at a certain term, begun and held on a certain day, and to have been drawn up during that term. Although it may be said therein “it
 
 ivas
 
 ordered,” no one can misunderstand the meaning. The enquiry is, when was it ordered; and the answer is, during that term. It must be so understood; and if it was at any period of the term, it is sufficient.
 

 Some objections are also raised upon the transcript from Richmond. One is, that it also uses the past tense; and that, of course, falls with the preceding one. Another is, that the record states the Court not to have begun on the proper day, namely, the third Monday of September, but makes it begin the proceedings at the
 
 fourth
 
 Monday, without any adjournments from the third. But this is a clear mistake of the law fixing the terms of that Court. In the Spring, the
 
 *126
 
 statute provides that the Court shall be held on the third Monday of March; but in Autumn, it is on the fourth Monday of September.
 

 ^ record, it appears that the two prisoners, Martin and Waddill, were put upon trial together; but the transcript does not set forth the verdict as to Waddill, but only as to Martin, the present appellant. For this cause, also, it is said the judgment is erroneous. But we do not perceive how this prisoner is concerned in that matter. It were well, if the clerk would send a full transcript in every case, and not take on himself to judge which parts of the verdict and judgment are material. But we cannot assume, that the whole has not been sent; and on the contrary, unless a diminution be suggested, it is taken that the transcript is full and correct. If so, the conviction of this prisoner is not annulled by the failure of the jury to render a verdict as to the other party — which, indeed, is an acquittal. The Court was bound to pass sentence on him, whom the Court did find guilty, since the jury has responded
 
 fully to the
 
 only issue joined between the State and this prisoner.
 

 Upon the whole, the Court is of opinion that the judgment of the Superior Court of Richmond was warranted by the record; and directs that this opinion be certified to that Court, that the judgment may be carried into execution.
 

 Per Curiam. Ordered accordingly.