## STATE v. EXUM.

(Filed March 21, 1905.)

*Homicide—Threats—Examination of Witness—Statements While Under Arrest—Evidence of Character and Habits of Deceased—When Competent—Hypnotism—Impeaching and Corroborating Evidence—Comments of Counsel—Deliberation and Premeditation—Manslaughter—Charge.*

1. In an indictment for homicide which occurred in September, evidence of threats made by the prisoner the same year, showing deep seated animosity against the deceased, or of threats to take his life is competent.

2. Where evidence of threats against the deceased was so involved that it would be meaningless unless the entire statement, which also showed threats against other persons, was given, it was not error to admit such statement, where the court instructed the jury that it was competent only as to the deceased and incompetent as to the other persons.

3. A witness gave his evidence without being sworn and this being discovered, he was sworn and re-stated his testimony, it is no ground for a new trial, where the court told the jury that "they must disregard each and every statement made by the witness before he was sworn and must not consider anything which the witness had then said as evidence in the case."

4. An exception to a statement pertinent to the inquiry made by the prisoner to a deputy sheriff when that officer had him in custody, for the reason that he was at the time in custody, is without merit.

5. On a trial for homicide neither the character and habits of the deceased, nor even his disposition towards the prisoner is relevant to the issue; except (1) when there is evidence tending to show that the killing may have been done in self-defense; or (2) where the evidence is wholly circumstantial and the character of the transaction is in doubt.

6. Where the ruling of the court in rejecting the evidence of a witness was correct at the time the evidence was offered and as the facts then appeared, its rejection was not error, though at a later stage of the trial it became competent; and if the prisoner desired the benefit of this evidence, he should have offered it after the development of the trial had made it competent.

7. Where the prisoner testified that he had hypnotized his wife and his evidence tended to show that he had influence over her to .a greater extent than usually arises from the relationship between them, it was not error to permit the State to ask the wife on cross-examination if she had not been hypnotized by her husband, as affecting her credibility.

8. Where the wife testified as an eye witness to the homicide, contradictory of the State's testimony and tending to support her husband's claim, that the killing was in self-defense, her declaration, "O, little did I think I would have married a murderer in my own family," was competent as impeaching evidence.

9. An affidavit made by a witness in the presence of the prisoner's wife who said it was correct, is admissible, not as substantive evidence, but for the purpose of corroborating the witness, and contradicting the wife who had testified for her husband.

10. Whenever the credit of a witness is impeached, whether by proof of general bad character or by contradictory statements by himself, or by cross-examination tending to impeach his veracity or memory, or at times by his very position in reference to the cause and its parties, it may be restored or strengthened by any proper evidence tending to restore confidence in his veracity and in the truthfulness of his testimony, whether such evidence appears in a verbal or written statement, verified or not, or whether the previous statements were made *ante litem motam* or pending the controversy.

11. A letter of the prisoner, concerning the deceased which tended to show ill will against the deceased is competent for that purpose.

12. Comments of counsel in the argument to a jury are under the supervision of the trial judge and this court will not interfere with the exercise of his discretion unless it plainly appears that he has been too vigorous or too lax in the exercise of it to the detriment of the parties.

13. In an indictment for homicide, evidence that the prisoner had strong enmity towards the deceased and had several times threatened to kill him, and when they were in the same room, the prisoner withdrew, but on hearing an opprobrious epithet immediately returned and after asking whom the deceased meant, siezed his pistol and advanced on the deceased who was unarmed in a reclining attitude, and as the deceased was endeavoring to escape, shot him, and as his victim fell helpless before him, he fires another shot, causing instant death, pushing aside the interposing arm of his wife, the mother of the deceased; *held*, that the evidence was sufficient to warrant a verdict of murder in the first degree.

14. In an indictment for homicide where the evidence shows that just as the prisoner was withdrawing from the scene of the killing, he was met by the brother of the deceased, drew his pistol on the brother and made him stand off, so that he could withdraw without hindrance, an instruction to the jury that "in determining the question of premeditation and deliberation it is competent for the jury to take into their consideration the conduct of the prisoner before and after, as well as at the time of the homicide and all of the circumstances connected with the homicide," is not erroneous.

15. Where the judge in his charge to the jury gives a full explanation of both the statutory terms "deliberate" and "premeditate" in words which express both ideas and excludes all idea of a killing from passion suddenly aroused, and directs the jury before they can convict of the higher crime that the killing must be from a fixed determination, previously formed, after weighing the matter, it is correct, though the judge did not define each term separately.

16. The following instruction on the question of manslaughter is correct: "If you should find from the evidence that the prisoner willingly engaged in the fight with the deceased, and that the deceased threw his hand to his hip pocket and advanced upon the prisoner in a threatening manner, and that the prisoner, being willing to fight seized a pistol and shot the deceased and the deceased died from the wound, the prisoner would be guilty of manslaughter, provided that you should find from the evidence that the appearance and manner of the deceased were such as to cause the prisoner to believe that the deceased was armed with a deadly weapon, and that the prisoner did believe he was thus armed and was about to harm him with it."

17. The charge to a jury must be considered as a whole in the same connected way in which it was given, and upon the presumption that the jury did not overlook any portion of it. If, when so construed, it presents the law fairly and correctly, it will afford no ground for reversing the judgment, though some of the expressions, when standing alone, might be regarded as erroneous.

INDICTMENT against William Exum, heard by *Judge Fred Moore* and a jury, at September Term, 1904, of the Superior Court of LENOIR County for the murder of Guy Walston.

The evidence on the part of the State tends to show that the homicide occurred on Saturday, September 3, 1904, at the house of Runie Walston in Lenoir County. Mrs. Exum (formerly Mrs. Walston), the mother of the deceased and of Runie Walston, and wife of the prisoner, was on a visit, with her husband, at the home of her son, Runie, whose wife was confined in bed by fever. They arrived on Tuesday before the homicide occurred on Saturday next. Guy, the deceased, who had been working in Greene County about twenty miles away, came on Saturday.

The following named persons witnessed the shooting: Mrs. Mary A. Walston, wife of Runie, Mrs. Exum, wife of the prisoner, and Miss Zenobia Jones. After the dinner the prisoner went into the room of Mrs. Walston. Miss Jones was there when the prisoner entered. Guy came in and sat down by the bedside of Mrs. Walston, near an open window, with his head on a pillow and his feet on a sewing machine, and was fanning Mrs. Walston. The prisoner retired when Guy came in, going to an adjoining room. Mrs. Exum came in and sat down at the foot of the bed, and she and Guy commenced talking. She was telling him about Exum going down the country next week to look for a place to live another year, and Guy asked his mother if she was going with Exum and she said, "Yes, I reckon I will." Guy then made use of an opprobrious epithet about Exum. Exum then pushed the ell door open and came into the room and asked Guy whom he was talking about, and Guy laughed and said "you." Exum then reached up on the book case and got his pistol and came towards him with pistol pointed at him. When he got to the east corner of the fire place, Mrs. Exum pushed him back in the corner next to the bureau, and tried to take the pistol away from him. Guy then jumped up and ran for the door. Just as he passed and was midway of the fireplace, Exum whirled and shot him in the left shoulder. Guy turned, fell forward and put his arms around his mother's waist and swung around on the hearth. As he fell forward, Exum put his pistol to his head and fired the second shot into his brain, causing his instant death.

The physician stated that the first shot entered the left arm just below the shoulder, and from behind passed through the blade, broke the third rib and embedded itself in the spinal column, third dorsal, fracturing the third dorsal vertebrae; that the effect would cause paralysis from the fracture down, and the person who fired did so from behind, not directly, but at an angle.

The prisoner offered evidence to show that he and his wife had gone to the house of Runie Walston from their home in Greene County, having been sent for, that his wife might assist in nursing Mrs. Runie Walston, who was sick in bed, from fever. He testified that he was in the room where Mrs. Walston was in bed, and Guy came in, and witness withdrew into an adjoining room. Mrs. Exum and Guy (the deceased) commenced talking, and in their conversation Guy made use of an offensive remark about witness. When he re-entered the room and asked him whom he was talking about, he said, "you, Will," and I said, "Guy, I wish you would please quit talking about me and calling me names, as you just now called me," and he said, "I will quit when I get ready, and fix you besides." He then threw his hand to his hip pocket, his left hand was on the window sill in front of which he was lying, and raised up. At this juncture Miss Jones went out. "I reached then and took my pistol off the book case. Guy had advanced some then, and I said, 'stop, Guy, stop, don't come on me,' and he said 'I will stop when I fix you.' My wife was running towards me then and she said 'don't shoot in here, it will scare Alice;' I said, 'Well, he is going to kill me.' Then I presented my pistol to shoot him in the right arm, and just as I presented my pistol to fire, he turned his left side to me and I fired. My wife jumped between us. Guy threw his left hand on her left shoulder and was looking over her right shoulder into my face. Then I felt something striking me in my left side ('about here') and I threw my pistol over her head. She said, 'Don't shoot any more,' and I said, 'he will kill me,' and I fired." The prisoner was convicted of murder in the first degree and from the sentence pronounced on the verdict appealed.

*Robert D. Gilmer, Attorney-General,* for the State.

*N. J. Rouse, Loftin & Varser* and *Aycock & Daniels* for the prisoner.

HOKE, J., after stating the case: We have given this record and the exceptions noted in the case on appeal the close scrutiny and careful consideration which the supreme importance of the issue demands, and can find no error to the prejudice of the prisoner or his cause.

The first twelve exceptions, and exceptions 16 and 17, are to the admission of evidence showing previous threats on the part of the prisoner against the deceased. These threats were in July previous, and some as far back as January or February, 1904. They tend to show deep seated animosity against the deceased, some of them amounting to direct threats to take his life, and are undoubtedly competent. *State v. Hunt,* 128 N. C., 584, 587; *State v. Moore,* 104 N. C., 743.

We suppose the real objection insisted on here is to the threat testified to by Runie Walston (page 18 of the record), in the following language: "He (the prisoner) said that not only Cousin Sam, but Guy had told on him things that were wrong, and that a man by the name of John Shackleford liked to have got him into trouble, and if the report about Cousin Sam be true, he was going to kill him, and while he was up there he was going to get the other two." It would not be competent as a separate proposition to show threats against other persons than the deceased, but this statement as to the others is so involved in the threat against the deceased that it was necessary to give the entire statement to make the jury properly apprehend its significance as against the deceased. "He was going to get the other two," standing by itself, would be meaningless, and by giving the entire statement, it became perfectly plain. His Honor was careful to tell the jury that this conversation was only competent, and should only be considered as evidence, in so far as it related to Guy Walston, and any statement in reference to Shackleford and others was incompetent. Only that referring to the deceased is competent. So qualified and

explained there was no error in permitting the statement to go to the jury. *State v. Crane,* 110 N. C., 530.

Exceptions 13, 14 and 15: In swearing the witnesses, Mrs. Walston and Mrs. Jones were not present, and when called they gave their evidence without having been sworn. The inadvertence was discovered, and they were then properly sworn and re-stated their testimony to the jury. In this connection the judge told the jury "they must disregard each and every statement made by these witnesses before they were sworn, and must not consider anything which these witnesses had then said as evidence in the case." The judge pursued the only course proper and perhaps permissible under the circumstances, and the decisions are against the prisoner. A case very similar in our own court is *State v. Morris,* 84 N. C., 756. In that case *Ruffin, J.,* said: "We cannot see that the judge below could have proceeded, under the circumstances, otherwise that he did. If he had made a mistrial, it would have raised a serious question as to whether the prisoner, having once been in jeopardy, could again be put upon his trial. * * It is impossible for the law to foresee and provide for all the contingencies that may arise unexpectedly in the course of trial on the circuits, and something must be left to the discretion and sound judgment of the judge; and this court will not undertake to review the exercise of that discretion. It is true that if it should appear that this discretion had been so exercised that the prisoner had been deprived of a fair trial, this court, as said by the late Chief Justice in the case of *State v. Tilghman,* 11 Ired. 513 (33 N. C.), would assert the right to grant a new trial. But we cannot perceive that this prisoner's rights were in any way impaired by the action of His Honor in the premises." A similar decision has been made in 148 Penn., 639, 640.

Exceptions 18 to 22 are to statements pertinent to the inquiry, made by the prisoner to Tom Albridge, the deputy sheriff, when that officer had him in custody, for the reason

that he was at the time in custody. These exceptions are without merit, and have been frequently decided contrary to the prisoner's position. *State v. Daniels,* 134 N. C., 641; *State v. DeGraff,* 113 N. C., 688; *State v. Conly,* 130 N. C., 683.

Exceptions 23, 24 and 25 (p. 63 of the record), are in response to questions asked by counsel for the prisoner of Mrs. Exum, wife of the prisoner, the first witness who testified for the defense. The questions are as follows:

"At the time Guy and Exum lived with you, do you know whether it was Guy's habit to carry a pistol?" Objection by the State, objection sustained. Prisoner excepted.

"Do you know whether the deceased had the habit of carrying concealed weapons, and if so whether the prisoner knew of the habit?" Objection by State sustained. Prisoner excepted.

"State whether or not your son, Guy, became angry because of your marriage to Mr. Exum?" Objection by State sustained and prisoner excepted.

It is ordinarily true that on trial for homicide, neither the character and habits of the deceased nor even his disposition towards the prisoner is relevant to the issue. This is the general rule, and has been declared in this State by repeated decisions of our highest court. *State v. Barfield,* 30 N. C., 344; *State v. Hogue,* 51 N. C., 381; *State v. Chavis,* 80 N. C., 353; *State v. Craine,* 120 N. C., 601; *State v. Bird,* 121 N. C., 684. And there are certain exceptions to this rule, equally well supported by authority. *State v. Gooch,* 94 N. C., 987, *State v. Turpin,* 77 N. C., 473.

In *Turpin's case,* the exceptions are thus stated: "Such evidence is admissible when there is evidence tending to show that the killing may have been done on a principle of self-defense. (2) Where the evidence is wholly circumstantial and the character of the transaction is in doubt." If this evidence had been offered at a later stage of the trial

after the prisoner had testified, his evidence tending to show a killing in his necessary self-defense, its rejection would have been reversible error; but at the time the ruling of the court was made there was nothing to bring the proposed evidence within either of the above stated exceptions. Mrs. Exum was the first witness for the defense, and while her evidence was to some extent contradictory to the State's witnesses, who testified to the occurrence, and while it tended in several particulars to support the testimony of her husband afterwards received, yet, standing alone, her testimony was very far from making out a state of facts showing that the killing was from a principle of necessary self-preservation. Until her husband testified and gave significance to certain of her statements, supporting his claim to self-defense, her account was not necessarily inconsistent with the claim of the State. The proposed evidence, then, comes under neither of the exceptions; not under the second, for there were four eye witnesses to the transaction, and not under the first, as the evidence did not at that time tend to show a killing in the necessary self-defense of the prisoner. The evidence of Mrs. Exum is not set out here because of its length and because not necessary to explain the principle on which our decision rests, but all of it has been carefully read and considered.

We must not be understood as holding that if the ruling of the court below had been erroneous in rejecting this evidence that the error would have been cured by admitting the same testimony from the prisoner himself, and from other witnesses at a later stage of the trial, which was done. The authorities cited by the prisoner's counsel are apt to show that this would not be true. *State v. Rollins,* 113 N. C., 722. We rest our decision here on the ground that at the time the evidence was offered and as the facts then appeared, the ruling of the court was correct, and if the prisoner desired the benefit of the evidence from this witness, he should have

offered it after the development of the trial had made it competent. *State v. Cherry*, 63 N. C., 493.

The next four exceptions, 26, 27, 28 and 29, are insisted on because the court permitted the State to ask the witness (Mrs. Exum) if she had not been hypnotized by her husband; to which the witness answered' "Yes, three times." While this subject of hypnotism has received to some extent "judicial recognition" in the language of one·of the briefs, the sources of its power and the extent of its influence are in the main, unknown, and we must hesitate to enter on such a field in the search for error.

The prisoner testified to the effect that he had hypnotized his wife on three occasions, and, as explained by him, it tended to show that he had influence over her to a greater extent than usually arises from the relationship between them. If this be correct, the evidence is competent as affecting her credibility, and, if not, then we are unable to perceive how the prisoner's case was prejudiced by its admission.

The next two exceptions were on the evidence of J. H. Newsome, who was permitted to testify to certain declarations of Mrs. Exum, wife of the prisoner. This witness said that Mrs. Exum on the day of the homicide gave him her account of the occurrence, and as stated by him contradicting to some extent her testimony on the trial, and in this connection that Mrs. Exum had said in the witness's presence, "O, little did I think that I would have married a murderer in my own family." While Mrs. Exum's testimony, standing alone, did not tend to show a killing in self-defense until after her husband had testified stating such claim on his part, there were several features of her testimony which were contrary to the State's version, and when taken in connection with his testimony tended to support his claim, and such was the impression she evidently intended to make on the jury. To our minds this declaration was permissible as impeaching evidence. The court admitted it for that purpose

138——39

only, and so told the jury at the time it was received and again in his charge. This exception was strongly pressed on our attention, and the prisoner's first criticism on the testimony is that all the woman intended by this expression was to say that there had been a homicide, without meaning to say that it was criminal. If this be a correct interpretation, then the statement would be harmless, and in any event the objection would be to its force and not to its competency.

It is further urged however that this is not a statement of fact, but a conclusion or inference on the part of the witness, and we are referred to the cases of *State v. Rollins,* 113 N. C., 722, and *State v. Teachey,* 134 N. C., 656. In this last case the prosecution, in an indictment against a son sought to introduce a declaration of the father that, if the shooting was done at nine o'clock at night, he would have to give up the case, as he could not account for his son after seven o'clock. This decision was on the ground that there was nothing in the father's testimony which the declaration tended to contradict, and it was properly ruled out because, under the claim of contradiction, the effect of the evidence would be to admit against the son a declaration of the father that the son was likely guilty. In *State v. Rollins,* on an indictment for murder, a witness, Mary Brandon, who had testified as to hearing a crowd near her home using threatening language towards each other, was asked by the defendant, "What did you say to those that came to your door?"—the stated purpose being to obtain an answer that they were killing a man out there. It was in the night, and the woman had seen nothing of the occurrence, and on objection the question was held incompetent, as it was sought to put before the jury, as substantive evidence, a statement of the witness that was at most only an inference or surmise on her part. The court in the opinion said, "The question was properly ruled out. It could not serve to corroborate the witness as to what she saw, which would have been com-

petent, but only to show her belief or surmise at the time of the nature of the occurrence." The ruling here in our opinion does not conflict with either of these decisions; not with the case of *State v. Teachey,* for the witness had given testimony as an eye witness to the occurrence of which she was speaking, contradictory of the State's testimony and tending to support her husband's claim that the killing was in his necessary self-defense. Her declaration was therefore directly contradictory to her testimony. Nor with *State v. Rollins,* because the declaration was not any surmise or inference as to what the witness had not seen, but she was giving an impression as to an occurrence she had seen, and it was properly received as impeaching testimony. *Handy v. Canning,* 166 Mass., 107.

Exception 32 relates to the introduction of a deposition of Mrs. Mary Alice Walston. This is termed a deposition, but it was in fact an affidavit of Mrs. Walston, wife of Runie, taken and sworn to before a Justice of the Peace on the morning following the homicide. The justice, in his direct examination testified in regard to this paper that "Mrs. Exum, wife of the prisoner, was present, and as Mrs. Walston would make a statement he asked Mrs. Exum if that was about the way it occurred, and she said it was. Mrs. Exum corroborated the statements of Mrs. Runie Walston and said they were correct." The justice was asked the following questions:

"Did you read the statements to Mrs. Exum?" "I read them to Mrs. Walston, and Mrs. Exum was present."

"What did she say?" "I asked her if that was the correct statement as she saw it, and she nodded her head, as much as to say it was."

The court on this statement admitted the deposition, telling the jury that it was admitted only for the purpose of corroborating Mrs. Walston and contradicting Mrs. Exum and in no sense as substantive evidence. Later in the trial, and

in the charge, the court restricted the affidavit to corrobora-
tion of Mrs. Walston, and told the jury they would not con-
sider it at all as contradicting Mrs. Exum; but they could
consider what Mrs. Exum said about it in so far as that
tended to contradict her, and give it such weight for that pur-
pose as they thought it should receive.   The courts of this
country are not in accord as to the admission of this charac-
ter of evidence—previous consistent statements to corrobor-
ate a witness who testified at a trial.   Some of them reject
such evidence altogether as unsound in principle and danger-
ous in practice.   Some of those that admit the evidence
have placed restrictions upon it, which we think go rather
to its force than its competency; and the decisions of our
own State have gone some further perhaps than the others
in its admission.   All the courts admitting such evidence
are agreed that it is only competent as affecting the credibil-
ity of the witness, and is never used as substantive or inde-
pendent supporting testimony; and further, that it is never
admitted until the witness has been in some way impeached.
And it is held here by repeated and well supported adjudi-
cations that whenever a witness has given evidence in a
trial and his credibility is impugned, whether by proof of
general bad character or by contradictory statements by him-
self, or by cross examination tending to impeach the veracity
or memory of the witness, or at times by his very position in
reference to the cause and its parties, "in whatever way the
credit of the witness may be impeached," said *Smith, C. J.,*
in *Jones v. Jones,* 80 N. C., 246, "It may be restored or
strengthened by this or any other proper evidence tending to
restore confidence in his veracity and in the truthfulness of
his testimony."   *State v. Craine,* 120 N. C., 601; *Slate v.
Whitfield,* 92 N. C., 831.   And it makes no difference, in this
State at least, whether such evidence appears in a verbal or
written statement, nor whether verified or not.   *State v.
Craine, supra.*   Nor does it signify whether the previous

statements are near or more remote from the occurrence, nor *ante litem motam* or pending the controversy. *Jones v. Jones, supra.* Such circumstances only go to its force and not to its relevancy.

We think the decisions of our own court on this question can be supported by the better reason, but, however this may be, it has become the established rule for the trial of causes here, and we have now neither the right nor the disposition to disturb or question it. The law of this State and some of the reasons sustaining it are well stated by the *Chief Justice* in *Jones v. Jones, supra:* "The admissibility of previous correspondent accounts of the same transaction to confirm the testimony of an assailed witness, delivered on the trial, rests upon the obvious principle that as conflicting statements impair, so uniform and consistent statements sustain and strengthen his credit before the jury. The limitation on the rule contended for in the argument of defendant's counsel, which confines the evidence to such declarations as were made before the witness came under any bias or influence calculated to warp his testimony, is not supported in the numerous adjudications of this court, nor in our opinion by sound reason. The relationship of the witness to the cause or to the party for whom he tesifies is one among many sources of discredit this kind of evidence is intended to remove, and its application to the case supposed is a striking illustration of the usefulness and value of the rule. But its competency is not restricted to such cases. The evidence is admitted to repel any imputations upon the credibility of the witness, whether they spring out of such relationships, or arise from proof of general bad character, or of different versions of the fact given by himself, or result from the manner in which the cross-examination is conducted. In whatever way the credit of the witness may be impaired, it may be restored or strengthened by this or any other proper evidence tending to insure confidence in his veracity and in the truthfulness of his testimony.

Again, the accuracy of memory is·supported by proof that at or near the time when the facts deposed to have transpired, and were fresh in the mind of the witness, he gave the same version of them that he testified to on the trial. Suppose they had been written down and not since seen by the witness —would not the production of the written memorandum greatly confirm one's confidence in the integrity of his testimony to the same facts before the jury? It must be·observed however that this evidence is not received in proof of the facts themselves, but to sustain the credibility of the witness in what he swears on the trial. These principles are settled in numerous cases, among which we will only cite the following: *State v. George,* 30 N. C., 324; *Hoke v. Fleming,* 32 N. C., 263; *Stale v. Dove, Ibid.,* 469; *March v. Harrell,* 46 N. C., 329; *State v Laxton,* 78 N. C., 564; *State v. Parrish,* 79 N. C., 610."

The evidence was also competent for the purpose of contradicting Mrs. Exum, as she was present when the affidavit was made and said the satements in it are correct. The paper derived no force for the purpose it was here used, because it was signed and sworn to by Mrs. Walston. Mrs. Exum said it was correct, and that made it her declaration also if the jury believed the evidence. The court afterwards withdrew it from the jury as evidence for this last purpose. But this was in the prisoner's favor and gives him no ground for complaint.

Exception 33 to·the admission of a letter of the prisoner concerning the deceased is without merit. The letter tended to show ill will against the deceased and was competent for the purpose. And the same may be said of the exception advanced to the argument of the solicitor. In the part of the speech at all objectionable, the solicitor was promptly checked by the court, and the portion remaining was not improper. In *State v. Craine, supra,* where the court said "Comments of counsel in the argument to a jury are under the super-

vision of a trial judge, and this court will not interfere with the exercise of his discretion unless it plainly appears that he has been too vigorous or too lax in exercising it to the detriment of the parties."

The remaining objections are to the charge of the court, and none of them can be sustained. It is urged that on the entire testimony there is no sufficient evidence of premeditation to warrant a verdict of murder in the first degree.

Here is testimony tending to show that the prisoner had strong enmity towards the deceased and had several times made threats against him—in some of them expressing an intention to take his life. When they are together in the same room, the prisoner temporarily withdraws, but on hearing an opprobrious epithet immediately returns, and after asking whom the deceased meant, seizes his pistol, advances on an unarmed man in a reclining attitude, and, as the deceased was endeavoring to escape he fires a shot which lodges in his backbone, paralyzing his lower limbs, and, as his victim falls helpless before him, he fires another bullet into his brain, causing instant death; pushing aside the interposing arm of his wife, the mother of the deceased, to make his aim more certain and deadly. A mere statement of the testimony is in itself a sufficient answer to the exception, and citation of authority is not required.

Again, it is alleged for error that the court in charging the jury on murder in the first degree said: "In determining the question of premeditation and deliberation, it is competent for the jury to take into their consideration the conduct of the prisoner before and after, as well as at the time of, the homicide, and all the circumstances connected with the homicide," and counsel cite in support of this position the case of *State v. Foster,* 130 N. C., 675. In that case, on indictment for murder in the first degree, the prisoner had admitted his guilt of murder in the second degree, and the debated question was on his guilt or innocence of the higher offense.

There was evidence showing the flight of the prisoner after the homicide, and the court in submitting the evidence to the jury said that his flight was a circumstance to be considered by the jury in determining whether the killing was premeditated murder. The Supreme Court awarded a new trial and in the opinion held that, on the facts of that case, flight was not a circumstance to be specially called to the jury's attention, and in this connection the court said: "We are entirely unable to see why the attention of the jury should be especially called to the prisoner's flight in the charge of the court, and told that this was a circumstance they must consider in connection with the other evidence in making up their verdict. We entirely fail to see how it shows or tended to prove deliberation and premeditation on the part of the prisoner, and that was the only matter the jury had to consider, as it had been admitted that the prisoner was guilty of murder in the second degree." It will be noted that in the charge of the court below in *Foster's case* the judge was adverting to the evidence on the question, and directed the jury in express terms to consider the flight as a circumstance on premeditated murder when there was an admitted offense of lower grade, but sufficient to account for it. The case is not authority for sustaining the exception. In the case now before us the judge was defining the term "premeditation" and only referred to the evidence in a general way. He was not presenting the testimony to the jury.

There was conduct of the prisoner immediately after and part of the occurrence pertinent for consideration, to-wit, just as the prisoner was withdrawing from the scene, he was met by the brother of the deceased, drew his pistol on the brother and made him stand off, so that he could withdraw without let or hindrance—the act of a deliberate, determined man, and so far as we can discover this was the only evidence of subsequent conduct on the part of the prisoner at all relevant to this feature of the inquiry. We can discover no evidence

of flight.   The prisoner spoke to the officer about how he intended to escape, but no conduct of his could receive any such construction.   But if there had been, it is fair to refer the remark of the court, made in this general way, to the testimony that was relevant, and we have no doubt the jury so understood it.   Even in trials for homicide, error must be shown.   Thompson on Trials, sec. 118.

Again, it is contended that the charge is erroneous because while explaining to the jury the meaning of "premeditated," the court did not explain the term "deliberate," both words being used in the statute defining the crime of murder in the first degree.   But to our minds the charge is not open to any such objection.   The judge told the jury among other things on the subject: "The word 'premeditate' means to think beforehand, as when a man thinks about the commission of an act and concludes and determines in his mind to commit the act.   He has thus premeditated the commission of the act. The law does not lay down any rule as to the time which must elapse between the moment when a person premeditates or comes to a determination in his own mind to kill another person, and the moment when he does the killing, as a test. It is not a question of time.   It is merely a question of whether the accused formed in his own mind the determination to kill the deceased and then at some subsequent time, either immediate or remote, does carry his previously formed determination into effect by killing the deceased.   If there be an intent to kill and a simultaneous killing, then there is no premeditation.   If the prisoner weighed the purpose of killing long enough to form a fixed design to kill, and at a subsequent time, no matter how soon or how remote, put it into execution, there was sufficient premeditation to warrant the jury in finding murder in the first degree."

The two terms "deliberate" and "premeditate," while frequently used in this connection as interchangeable, because perhaps the facts do not always require that they should be

spoken of separately, have not exactly the same meaning. "Premeditate" involves the idea of prior consideration, while "deliberation" rather indicates reflection, a weighing of the consequences of the act in more or less calmness. But if the charge of the judge is in words which express both ideas and which fully explain them to the jury, it is correct, though the judge may not define each term separately. *State v. Lang,* 84 Ala., 1.

In the charge before us, the judge gives a full explanation of both the statutory words, defining the crime. He excludes all idea of a killing from passion suddenly aroused, and directs the jury before they can convict of the higher crime, that the killing must be from a fixed determination previously formed after weighing the matter. It comes fully up to the requirements of the law on the question and is well supported by authority. *State v. Hunt,* 134 N. C., 684; *State v. Spivey,* 132 N. C., 989.

There is another exception taken, that the judge below did not define the crime of manslaughter, and gave an erroneous charge concerning it. The judge did not give any abstract definition of manslaughter, but he did better; he defined manslaugter as applied to the facts in the case before him, and he defined it correctly. *State v. Martin,* 24 N. C., 101. It is there said: "The court is not bound to lay down to the jury an abstract proposition, but only to state the law as applicable to the evidence introduced."

The court charged the jury on the question of manslaughter: "If you should find from the evidence that the prisoner willingly engaged in a fight with the deceased, and that the deceased threw his hand to his hip pocket and advanced upon the prisoner in a threatening manner, and that the prisoner, being willing to fight, seized a pistol and shot the deceased and the deceased died from the wound (then inflicted by the prisoner), the prisoner would be guilty of manslaughter, provided that you should find from the evidence that the ap-

pearance .and manner of the deceased were such as to cause the prisoner to believe that the deceased was armed with a deadly weapon, and that the prisoner did believe he was armed with a deadly weapon and was about to harm him with it." The charge is supported by abundant authority. *State v. Kennedy,* 91 N. C., 572; *State v. Brittain,* 89 N. C., 481.

The remaining exceptions to the charge are without merit. They are formulated by making excerpts from different portions of the charge, and, so presented and separated from the context, some of them might be the subject of criticism. But this is not the correct way to interpret a charge. "It is to be considered as a whole in the same connected way in which it was given, and upon the presumption that the jury did not overlook any portion of it. If, when so construed, it presents the law fairly and correctly to the jury, it will afford no ground for reversing the judgment, though some of the expressions, when standing alone, might be regarded as erroneous." 2 Thompson on Trials, sec. 2407.

The charge of the court, taken as a whole, is full, clear and comprehensive. The prisoner has had a fair and impartial trial, and. we find no error in the record.

No Error.