STATE v. FREDERICK E. HANES.

(Filed 19 October, 1966.)

**Criminal Law §§ 101, 139—**

The victim's positive identification of defendant as the person who had robbed her, such identification being made some four days after the offense, is sufficient to take the issue to the jury, notwithstanding discrepancies in the victim's testimony as to identity and the fact that defendant did not fit the description given by the victim immediately after the offense, and the Supreme Court must perforce sustain the conviction in the absence of error of law in the trial, it not being the function of the Supreme Court to pass on the credibility of witnesses or to weigh the testimony.

APPEAL by defendant from *McLean, J.,* April 4, 1966, Regular Criminal Session of MECKLENBURG.

This is a criminal prosecution on a bill of indictment charging that defendant on January 26, 1966, "unlawfully, willfully and feloniously did make an assault on Rebecca Wallace and him in bodily fear and danger of his life did put, and $15.00 in lawful money of the United States, the property of Rebecca Wallace, of the value of less than $200.00, to wit: $15.00 from the person and possession of the said Rebecca Wallace, then and there did unlawfully, willfully, feloniously, forcibly and violently take, rob, steal, and carry away against the form of the Statute," etc.

Plea: Not guilty.

Verdict: Guilty as charged.

Judgment: Imprisonment in the common jail of Mecklenburg County for a period of not less than seven nor more than ten years. Defendant excepted and appealed.

*Attorney General Bruton and Staff Attorney White for the State. J. M. Scarborough for defendant appellant.*

BOBBITT, J. When first examined, Rebecca Wallace, on whose testimony the State's case is based, testified:

*Direct examination:* She is forty years old. On January 26, 1966, and prior thereto, she lived at 819 East Hill Street, Charlotte, N. C. She worked "every day" for Edgar Hazel Alexander at the Launderette at 808 East Hill Street. On January 26, 1966, as usual, she got off from work about 7:30 p.m. She went to her home, about a block from where she worked. She had $15.00 of her employer's money in her pocketbook. After she got home, "a little after 8:00 when the big snow was," the knob on her front door turned. Thinking it was one of her boys, she opened the door. Defendant came in and told her if she screamed he would blow her "g . . d . . . brains out." Her pocketbook containing the $15.00 was "right by (her) big chair in (her) bedroom." Defendant took "(her) pocketbook and money" and "took off out the (front) door." She could not tell "where he went." She went back to the Launderette, told her employer, Alexander, what had happened and he "called the law." She "hadn't been knowing the defendant too long." She had "(s)een him a lot, but didn't know his name."

*Cross-examination:* Defendant "had a knife open in his hand," but she "didn't see no pistol." Defendant "lives up the street from (her). (She) saw him every day." She had "been knowing him a year." She told the police at the Launderette that night "who it was." Defendant was not arrested that night. He was arrested four or five days later.

At the conclusion of the foregoing testimony, the solicitor announced: "That is the case for the State."

The court, in the absence of the jury, made inquiry concerning the whereabouts of Alexander and of police officers who had investigated the matter. No further evidence was heard that day *in the presence of the jury.* It was learned that the "boss-lady" was present. She (Mrs. Edgar Hazel Alexander) was sworn as a witness and examined by the court *in the absence of the jury.* The record indicates that she testified in part as follows: "Becky ought to know because *they* came to her house. She had just left our place

and Winky and this other boy watched her and she was unlocking her door on the porch and he pushed her in her house and had a knife on her and she had our sack and our money, and he cursed and told her he would cut her and she went on through the room by herself and he ran out the door with her pocketbook." (Our italics.) This testimony was not heard by the jury.

When court resumed the following morning, Edgar Hazel Alexander testified: He runs the McDowell Street Launderette. Rebecca Wallace is his employee. When she left the Launderette on the night of January 26, 1966, he, as usual, gave her $15.00 in change for use when she came to work "at one o'clock" the next day. She left and went home. In a short time she came back and told him "somebody" had come in her house and had taken her pocketbook. He called the police. He testified: "She didn't tell me the person's name that night, but said she would know him if she saw ·him."

Officer Samuel H. Kellman, a patrolman, testified he went to the Launderette on McDowell Street in response to the call; that he talked with Rebecca Wallace; that she did not give him the name of any person but described him as being "about 5 feet 10 inches tall, 160 pounds, approximately 20 years of age," and as having "a dark cap on and a dark coat." He testified that "(they) cruised around in the patrol car," searching the area in an effort "to find a subject fitting this description." They did not go to any house. They turned over their report to the Detective Department about 10:45 p.m. when they went off duty.

Officer W. O. Holmberg, a detective, testified he talked with Rebecca Wallace on February 1, 1966, at her home. He had tried to contact her on other occasions but had been unable to do so. She told him that "she knew the man by the name of Frederick and that he lived up the street" and pointed to the house. Holmberg and his associate (Detective Europa) went to the house and talked with defendant's brother. They did not search the house. They saw defendant at the Second Ward High School the same day they talked with Rebecca Wallace. Later, when defendant and Rebecca Wallace were present, "Rebecca pointed an accusing finger at Frederick" and stated "she wanted a warrant signed against him."

At the beginning of the cross-examination of Detective Holmberg, the following occurred:

"Q. What other investigation did you make?

"A. We investigated the matter further and learned that Frederick Hanes was not the one.

"SOLICITOR: Objection.

"COURT: Sustained."

Defendant excepted to this ruling.

Holmberg testified: "She (Rebecca Wallace) told me that she knew his name, been knowing him for some time. She lived on the corner of Hill and McDowell Streets and he lives approximately four to five doors up west on East Hill Street, on the opposite side. He lives on the south side and she lives on the north side of Hill Street." He testified Rebecca Wallace told him the man "was wearing a coat and hat."

Rebecca Wallace, when recalled, testified: In addition to the $15.00 that belonged to the Launderette, there was another $15.00 in her pocketbook that belonged to her, $30.00 in all. When she stated at the Detective Bureau defendant was the one who had robbed her, defendant "told the detective that (she) didn't know what (she) was talking about." Her testimony on cross-examination, as shown by the record, includes the following: "He didn't wear no cap. I told the detective he did have on a cap. I say yes, he did have on a dark cap. He was dressed in black. He had on a coat. It shore was bitter cold. It was not an overcoat he was wearing, it was a short coat. It was black."

Defendant, a witness in his own behalf, testified in substance, except when quoted, as follows: He is nineteen years old. He goes to Second Ward High School. He has never been indicted or charged with anything in his life. He has not had a cap in his life. He remembers the night in question. It was cold. He lives with his grandmother and brothers. He got out of school that day about 3:15 p.m., went to his home and did not leave until the next day. Between 7:30 and 8:30 that night he was at home cooking for the family. He is 6 feet 1½ inches tall and weighs 195 pounds. Prior to January 26, 1966, he had seen Rebecca Wallace around the McDowell Street Launderette and she had seen him.

Defendant's testimony was corroborated by the testimony of three brothers and his grandmother.

After the jury had returned its verdict and judgment was pronounced, defendant was granted an opportunity to offer additional evidence before the commitment was issued. This additional evidence consisted of the testimony of the following witnesses: W. T. Newton, a teacher at Second Ward High School; Ernest A. Stanberry, Assistant Principal at Second Ward High School; Marjorie Bilton, in charge of scholarships at Second Ward High School; and Detective W. O. Holmberg. Those connected with Second Ward High School testified that they knew defendant well; that his general reputation was good; that he played basketball and football; and that athletic scholarships had been offered to him. According to Holmberg, the statements made by defendant when first ap-

proached by the detectives at Second Ward High School were in accord with defendant's testimony at the trial. Holmberg testified: "(H)e didn't know he was going to be arrested until we walked in the school and asked the principal to call him to his office that we wanted to talk with him." Again: "I know another boy whose name is Freddy, nicknamed Freddy, a Peter Barber. He used to live in the 700-block of South McDowell Street. It's approximately a block from her house."

We have read the record again and again. Frankly, we have been unable to detect any error of law deemed a sufficient basis for a new trial. The brief filed by defendant's counsel does not point to such error. It was not competent for Detective Holmberg to testify during the trial that he and his fellow-detective had "investigated the matter further and (had) learned that Frederick Hanes was not the one." The record does not show the nature and results of their further investigation. The impression prevails that these detectives were of opinion the other "Freddy" was involved, not this defendant.

If the defendant had entered Rebecca Wallace's home, it would seem that she would be much impressed by the height of a young man who was 6 feet and 1½ inches tall. Defendant lived on the same block with Rebecca Wallace. She knew him by sight if not by name. Nothing in the record indicates he was not at home or in the neighborhood or at the Second Ward High School during the period from January 26, 1966, until February 1, 1966, when the detectives approached him while he was in school at Second Ward High School. The testimony of witnesses to whom Rebecca Wallace related the details of the alleged robbery tends to corroborate her in some respects and to contradict her in other respects. The testimony of Mrs. Alexander, given in the absence of the jury, recounts a factual situation radically different from that recounted in Rebecca Wallace's testimony.

The State's entire case depends on the accuracy of Rebecca Wallace's testimony. No pocketbook was traced to defendant. No money was traced to defendant. There is no evidence, other than the testimony of Rebecca Wallace, that defendant was seen at any place outside his home on the night of January 26, 1966. In short, the testimony of Rebecca Wallace is not corroborated by any objective evidential fact.

It is not the function of this Court to pass on the credibility of witnesses or to weigh the testimony. The jury, under a charge free from prejudicial error, returned a verdict of guilty as charged. We are well aware that often the cold record does not reflect the whole picture. However, on the record before us, there seems to be grave doubt as to the guilt of this defendant. We commend the case to the

Board of Paroles for immediate investigation. It would be a tragedy indeed if the life of a young man of good general reputation whose record is entirely clear of law violations, and who is currently pursuing his education, were to be blighted by a long imprisonment for a crime he did not commit.

This Court finds no error in law sufficient to constitute a basis for awarding a new trial.

No error.