**UNITED STATES of America, Plaintiff,**

v.

**Herbert L. HEDGEMAN et al., Defendants.**

**No. 73 CR 42.**

United States District Court, N. D. Illinois, E. D.

Nov. 30, 1973.

James R. Thompson, U. S. Atty., J. S. Montana, and M. G. Berland, Asst. U. S. Attys., Chicago, Ill., for plaintiff.

James D. Montgomery, Chicago, Ill., for defendant Hedgeman.

## MEMORANDUM OF DECISION ON DEFENDANT HEDGEMAN'S MOTION TO SUPPRESS

TONE, District Judge.

Defendant Hedgeman has moved to suppress an oral statement made by him to agents of the F.B.I. while he was in custody following his arrest on a warrant issued after the filing of the indict-

ment. The following facts appear from the evidence offered at the hearing on the motion:

The warrant for Hedgeman's arrest following the indictment in this case was executed January 19, 1973 by F.B.I. Agents Thomas J. MacGeorge and Robert Whiting, who went to Hedgeman's home to arrest him at about 7:45 A.M. on that date. After asking and being granted permission to call his attorney, Hedgeman made a telephone call to the home of James D. Montgomery, the attorney who, as Agent MacGeorge was aware, had been representing Hedgeman in connection with the investigation which led to the indictment. Hedgeman learned from Montgomery's wife that Montgomery was out of the city and could not be reached. She told him she would have Montgomery's associate, Clayton J. Adams, call Hedgeman.

Shortly thereafter Hedgeman received a telephone call from Adams, a young attorney employed by Montgomery. Adams told Hedgeman not to make any statement to the F.B.I. and asked to talk to one of the agents. When Agent Whiting came on the phone, Adams said he had instructed Hedgeman not to say anything to the F.B.I.[1] and asked where they were going to take Hedgeman. Whiting said they were going to take him to the F.B.I. offices in the Federal Building, "where he would be photographed and fingerprinted . . . and we would obtain basic background data, date of birth and so on, and then we would turn him over to the United States Marshal's Office." He also told Adams it would probably take a half hour to an hour "to get down there" and that Adams "could then expect to meet Mr. Hedgeman on the 24th floor of the Marshal's Office." Whiting then returned the phone to Hedgeman, and Adams said he would meet Hedgeman at the Federal Building.

The agents allowed Hedgeman to comfort his wife and finish breakfast and then, at his request, took him to his office before proceeding to the Federal Building. En route, Agent Whiting advised Hedgeman of his rights and said he and MacGeorge had no intention of interviewing him in the car because they were not familiar enough with the facts of the case. Agent MacGeorge handed Hedgeman the standard F.B.I. waiver of rights form, which he read and said he understood. He declined, however, to sign the form when asked to do so.

When Hedgeman arrived at the Federal Building Agents Whiting and MacGeorge took him to the F.B.I. offices, where he was photographed and fingerprinted, and then took him to an F.B.I. interrogation room. Whiting asked him some "biographical" questions, and after about 15 minutes F.B.I. Agent Richard P. Kusserow, the special agent in charge of the investigation which led to the indictment, joined them in the interrogation room. He reintroduced himself to Hedgeman, whom he had met during the investigation, called him by his first name, and shook hands with him. Kusserow asked whether Hedgeman had been advised of his rights. Agent Whiting said he had been so advised in the Bureau car en route to the office. Hedgeman acknowledged that he had been advised. Agent Whiting then produced the waiver of rights form they had used in advising him, but the form was not retendered to Hedgeman.

Kusserow somehow formed the mistaken understanding that Hedgeman had signed the waiver of rights form, for Kusserow's memorandum of interview reported that Hedgeman had signed the form. Agent MacGeorge, who of course

---

1. Adams so testified. Agent Whiting denied that this was said. I am inclined to believe Adams, not because I think Agent Whiting was deliberately denying a statement that he remembered but because I believe he did not remember it and therefore easily convinced himself it was not said. Adams would be more likely to remember it, because it was more important to him. It was not news, or noteworthy, to Agent Whiting, and would not have been to the other agents, that Hedgeman's attorney would not want him to make a statement to the F.B.I. in the absence of his attorney.

knew Hedgeman had refused to sign the form, read and signed the same memorandum. There was never any discussion or inquiry by any agent, after Hedgeman's refusal to sign the waiver, concerning the refusal or Hedgeman's reasons therefor.

Kusserow asked Whiting whether Hedgeman "had been interviewed," and Whiting "responded no, that they had just processed him and were taking biographic data from him which they were almost completed in doing." Whiting then asked a couple of more questions concerning Hedgeman's "background data."

Then Kusserow turned to Hedgeman and asked, "Do you fully understand what is going on?" Hedgeman said he understood he was under arrest, "but he said that it is ridiculous, that it was a mistake and that it would not have happened if somebody would have talked to him beforehand." Kusserow said he would be happy to hear what Hedgeman had to say but inasmuch as he was not present when Hedgeman was advised of his rights he felt he should tell him that anything he said could be used in court. He also told Hedgeman he had a right to an attorney and to have him present during the interview.[2] Agent Whiting then said that Hedgeman had already called an attorney at his house and Hedgeman confirmed that he had, and, in response to a question from Kusserow, Hedgeman said Montgomery was still his attorney.[3]

Kusserow told Hedgeman that if he should "decide to say anything now without your attorney present that you could stop answering at any time." He asked Hedgeman if he understood that, and Hedgeman said he did.

Kusserow then asked Hedgeman whether he had "any questions as to anything that has transpired so far." Hedgeman said, yes, he wanted to know specifically what the charges were. Kusserow then summarized the charges and said Hedgeman would get a copy of the indictment when he got to the Marshal's Office.

Hedgeman then said, "This is ridiculous," that he had tried to talk to the F.H.A. area management office and the office of the United States Attorney and had even gone to Washington about the matter, but no one would listen to him. Then, according to Kusserow's testimony, the following transpired:

"Well," I said,—at that point, I said, "Well, we'll be happy to listen to anything you say and I will be happy to talk to you about it," and I said, "I don't necessarily need a confession from you," that I would—if he wanted to make any self-serving statement I would include that, but whatever transpired that the one thing I promised him was that I would give that information over to the United States Attorney and make them aware of it.

"I said, 'Now would you like to say anything?'

2. Kusserow testified in detail about this conversation, including the rights warning he gave Hedgeman. He did not testify he warned Hedgeman of his right to remain silent. MacGeorge testified that Kusserow mentioned the right to remain silent. Agent Whiting was a witness but was not asked for his recollection on this point. I find Kusserow's testimony as to the rights warning he gave and as to the substance and sequence of the entire conversation to be more accurate than that of MacGeorge. Kusserow, the agent in charge of the investigation, was much more familiar with and interested in the case than the other two agents, who were not even familiar enough with the case to interview Hedgeman, and he was much more likely than they to note and re-

member the details of what was said, the sequence of topics discussed and the manner in which the discussion turned into an interrogation by him of Hedgeman. It was Kusserow who prepared the memorandum of the interview, which neither side offered in evidence. I am satisfied that he was an intelligent witness, with a motivation to remember, who would not have left out anything favorable to the Government, and that he recalled what was said.

3. Both Agents Kusserow and MacGeorge knew that during the grand jury investigation Montgomery had represented Hedgeman in resisting a motion in the District Court to require Hedgeman to give handwriting exemplars.

"He said, 'Like what?'

"I said, 'Well, let's start off by letting me ask you this: Are you not the Department of Housing Urban Development Area Management Broker for South Chicago?'"

Kusserow then proceeded to interrogate Hedgeman for approximately 40 or 45 minutes [4] about matters relating to the charges in the indictment. It is the statements made during this interrogation that Hedgeman seeks to suppress.

The starting point is, of course, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in which the Court prescribed the following guidelines for determining whether there is a valid waiver of the constitutional rights delineated in that opinion:

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. (Pp. 444–445, 86 S.Ct. p. 1612.)

* * * * * *

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. (Pp. 473–474, 86 S.Ct. p. 1627.)

* * * * * *

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

* * *

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. (P. 475, 86 S.Ct. p. 1628.)

* * * * * *

"Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." (P. 476, 86 S.Ct. p. 1629.)

When the accused refuses to sign a written waiver of rights, the already "heavy burden" (Miranda v. Arizona, supra, 384 U.S. at 475, 86 S.Ct. 1602) of demonstrating that the accused knowingly, intelligently and voluntarily waived his rights is made greater. United States v. Jenkins, 440 F.2d 574, 576 (7th Cir. 1971); United States v. Nielsen, 392 F.2d 849, 853 (7th Cir. 1968). In the Nielsen case, the Court said:

"Here the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before

---

4. Adams went to the Marshal's office that morning, but of course did not find Hedgeman there and left without seeing him.

continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion."

The Government's burden is made even heavier by the fact that the agents knew at the time of the interrogation that the accused had retained counsel. As the Court of Appeals said in United States v. Smith, 379 F.2d 628, 633 (7th Cir. 1967), a case in which the conviction was not set aside because the statement in issue was made before the *Miranda* decision:

"We have held that the *Miranda* rule does not reach Smith's conviction. However, we are of the opinion that in post-*Miranda* cases the *Miranda* rule applies with *greater* force to preclude as unconstitutional the admission of statements resulting from in-custody interrogation *after known retainer or appointment of counsel* and without counsel's presence or approval, unless it very clearly appears that the accused deliberately and understandingly chose to forego the assistance of counsel at such interrogation." (Emphasis in original.)

█ Neither refusal to sign a written waiver of rights nor post-indictment interrogation with knowledge that the accused is represented by an attorney who is not present will automatically render an accused's statement inadmissible. In United States v. Crisp, 435 F.2d 354, 358–359 (7th Cir. 1970), the defendant's statement was held admissible despite the presence of both these circumstances, because he "persisted in his expressed desire" to make a statement, notwithstanding his awareness of his rights and his attorney's absence:

"Here the interview was conducted at the express request of defendant Crisp who persisted in his expressed desire to pass information to the Assistant United States Attorney even after having been informed of his rights and regardless of the absence of his attorney.

\* \* \* \* \* \*

"The crucial feature of both *Massiah* [Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)] and *McLeod* [State of Ohio v. McLeod, 1 Ohio St.2d 60, 203 N.E.2d 349 (1964), reversed per curiam, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965)] was the deliberate acquisition of information by police from a suspect under circumstances preventing his effective exercise or waiver of his rights to counsel at a time when those rights had clearly attached by virtue of his formal indictment. Here, however, defendant Crisp was fully warned of his rights before his statement and still he wished to inform the agents without the presence of his attorney. Although the agents could have informed Crisp's attorney before proceeding to the jail to interview his client, failure to do so does not require a reversal in this case."

The *Crisp* decision was distinguished in United States v. Jenkins, *supra*, 440 F.2d 574, 576 (7th Cir. 1971), in which the admission in evidence of statements made after refusal to sign a waiver of rights form was held to be reversible error, the Court stating:

"In *Crisp*, however, the accused's refusal to sign the waiver form was held not to be fatal to the government's case, for, after the refusal, Crisp clearly 'persisted in his expressed desire to pass information to the Assistant United States Attorney even after having been informed of his rights and regardless of the absence of his attorney.'

"In the case at bar, unlike *Crisp*, the record is devoid of any evidence to show that Jenkins' answers to the agent's questions were in fact voluntary or followed an intelligent (although unwritten) waiver by Jenkins."

In the instant case, Hedgeman had indicated a desire to consult with his attorney by attempting to reach Montgomery immediately upon his arrest. He arranged to have Adams, in Montgomery's

absence, meet him at the Federal Building. Hedgeman's conduct in refusing to sign the waiver of rights form, after reading it and stating that he understood it, was an indication that as of that time he did not wish to waive his rights, and his "apparent willingness to allow further questioning," about which I shall say more later, made his position at best equivocal. United States v. Nielsen, *supra*, 392 F.2d at 853 (7th Cir. 1968). Therefore, as the Court of Appeals said in *Nielsen*, "the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion." (392 F.2d at 853.) The failure of the law enforcement officers to follow this procedure resulted in reversal of the conviction in United States v. Jenkins, *supra*, 440 F.2d 574 (7th Cir. 1971). In the case at bar the agents did not make the further inquiry required by the *Nielsen* decision. Instead, Hedgeman was subtly led into an interrogation.

There was no attempt to comply with the requirements of *Nielsen*. After Hedgeman refused to sign the waiver form, the agents never again discussed his refusal with him. Kusserow, who conducted the interrogation, was never even advised of the refusal and, in fact, understood that the waiver form had been signed.

If we accept Kusserow's version of the supplementary warning given by him in the interrogation room, and I do for reasons stated in an earlier footnote, that warning failed to include advice of the right to remain silent. What Kusserow did say could reasonably have been construed as implying that an interrogation was going to be conducted in any event and the only question was whether Hedgeman should have his lawyer there, and that was not too important because if he went ahead without his attorney he could stop at any time. Such a warning might well tend to cajole Hedgeman into embarking on a conversation with Kusserow and, serve to water down and con-

fuse the warning given earlier in the F.B.I. automobile, and, if anything, aggravated the violation of the *Nielsen* requirement.

In determining what constitutes a waiver after the accused has refused to sign a waiver form, it must be remembered that even in the absence of such an indication from the accused that he wishes to remain silent, an intention to waive is not shown merely by the fact that the accused makes a statement. As *Miranda* expressly states (384 U.S. at 475, 86 S.Ct. at 1628): ". . . a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."

In *Crisp* (*supra*, 435 F.2d 354) the Government met its burden of showing waiver by proving that the accused desired to speak, notwithstanding his knowledge of his rights and the absence of his attorney, and persisted in that desire. The Court pointed this out in distinguishing *Crisp* in the *Jenkins* opinion (*supra*, 440 F.2d at 576). When the accused insists on speaking to the officers who have him in custody, his insistence is ample evidence of an intention to waive the right to remain silent. But the facts in this case, like those in *Jenkins*, fall far short of the showing made in *Crisp*. Hedgeman did not evidence any eagerness to provide information to the agents. His refusal to sign the waiver of rights form was not contradicted or diluted by any subsequent indication that he wished to waive his rights and give information to the F.B.I. He was not in the F.B.I. interrogation room by choice. He found himself there despite Agent Whiting's statement to Adams, Hedgeman's acting attorney, that, after Hedgeman was photographed and fingerprinted and "basic background data, date of birth and so on" was obtained, the agents "then . . . would turn him over to the United States Marshal's Office." Instead of doing what Agent Whiting had said they would do, they detained him in the F.B.

I. interrogation room so Agent Kusserow could interrogate him about the case.

Unlike Crisp, Hedgeman was not the moving party, insistent on furnishing information. Kusserow led him into the interrogation cleverly, by seizing on Hedgeman's complaint that he had tried to talk to various officials, including personnel in the United States Attorney's Office, obviously in an effort to forestall the indictment, but no one would listen to him. Kusserow said he would be happy to listen to him and would relay whatever he said to the United States Attorney. This was a statement calculated to mislead Hedgeman into believing that he might help himself by talking to Kusserow. One who is thus beguiled can hardly be said to have intelligently and voluntarily waived his right to remain silent. The Supreme Court said in *Miranda*, "Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." (384 U.S. at 476, 86 S.Ct. at 1629.) The Government has not met its heavy burden of showing that the waiver which Hedgeman initially declined to give when he refused to sign the waiver form was later made "voluntarily, knowingly and intelligently" as required by *Miranda* (384 U.S. at 476, 86 S.Ct. 1602).

The fact that an accused is known to be represented by an attorney does not, as the *Crisp* case demonstrates, mean that Government agents who have him properly in custody must close their ears when he insists on talking. But it is quite another matter for an F.B.I. agent in charge of the investigation, who after indictment necessarily is working closely with the Assistant United States Attorney in charge of the case and can fairly be said to be acting as his agent, to seek to interrogate an accused who the agent knows is represented by an attorney. If an attorney in a civil case, *post litem motam*, allowed his agent to interrogate his opponent's client without his opponent's consent, he would find no one to defend his conduct. Here the Assistant United States Attorney did not authorize in advance this conduct of the F.B.I. agents, but he seeks to obtain the benefit of it for his client the Government, for whom the F.B.I. agents acted. Even if such conduct were to be tolerated in the absence of aggravating circumstances, and I think it should not be, that is not the case here, where the agents utilized the circumstance of custody to keep the accused separated from his lawyer in order to extract a statement from him. That statement cannot be said to have been wholly voluntary and made after the accused voluntarily, knowingly and intelligently waived his constitutional rights.

The motion to suppress is therefore granted.