STATE OF NORTH CAROLINA v. GEORGE JAMES PATTERSON, JR.

No. 76

(Filed 17 December 1975)

1. **Homicide § 21— first degree murder — brutality of killing — sufficiency of evidence of premeditation and deliberation**

   In a first degree murder prosecution, evidence as to premeditation and deliberation was sufficient to carry the case to the jury where such evidence tended to show that there were previously existing hostile feelings between defendant and his deceased daughter, defendant had previously assaulted deceased, defendant was angry with his daughter because of her prosecution of him in district court, on the same day as the district court proceedings, defendant and deceased argued, defendant gave deceased fifteen minutes to leave the house, defendant went into the kitchen and got a meat cleaver, at the expiration of fifteen minutes defendant struck deceased numerous blows so that she was partially decapitated, and there were lacerations about deceased's neck, chin and face.

2. **Constitutional Law § 37; Criminal Law § 75— refusal to sign written waiver — existence of oral waiver**

   Refusal to sign a written waiver of rights is a fact which may tend to show that no waiver occurred, but it is not conclusive in the

face of other evidence tending to show waiver; moreover, there is no constitutional requirement that the waiver be in writing, and N. C. statute expressly permits oral waiver. G.S. 7A-457(c).

**3. Constitutional Law § 37; Criminal Law § 75— acts constituting oral waiver of rights**

Where defendant on 15 June told officers that he would tell them what they wanted to know, but not then, defendant was asked on 17 June if he wanted to tell officers what happened, defendant replied affirmatively and then stated that he didn't want an attorney but he wanted to call his daughter, defendant used the telephone, then sat back down and told officers he was ready to talk to them, such actions constituted an oral waiver of his constitutional rights.

**4. Constitutional Law § 37— refusal to sign waiver — oral waiver not precluded**

A refusal to sign a waiver form does not necessarily preclude a valid oral waiver.

**5. Criminal Law § 76— defendant's understanding of rights — opinion evidence inadmissible**

A witness may not give an opinion as to whether a defendant in a criminal case *understood* his rights but must instead detail the facts upon which the opinion rests.

**6. Constitutional Law § 37; Criminal Law § 76—defendant's understanding of rights — opinion evidence — no prejudicial error**

Although the trial court erred in allowing two officers to testify "in their opinion" defendant understood his rights, such error was not prejudicial to defendant since there was other competent evidence of defendant's understanding, including the fact that defendant attempted to exercise his right to counsel on two occasions, did in fact exercise his right to remain silent on one occasion, and at one time said that he understood his rights.

**7. Criminal Law §§ 34, 75— confession — disclosure of separate offense — admissibility of confession**

Though a part of defendant's confession disclosed the commission of another offense by defendant, the confession was nevertheless admissible since it tended to establish a motive for the murder for which defendant was on trial.

**8. Constitutional Law §§ 32, 37— waiver of counsel**

A defendant may waive the presence of an attorney in a case under investigation when the attorney represents him on an unrelated charge.

**9. Criminal Law § 29— indigent defendant — no right to third psychiatric examination paid for by State**

An indigent defendant who has been criminally accused and who has already been provided with two psychiatric experts at State expense, whose findings do not suggest that defendant is or has been legally insane or that he is incompetent to stand trial, and whose competency and standing in their profession have not been challenged, is

State v. Patterson

not entitled by reason of constitutional due process or equal protection to have the State furnish him still another psychiatrist selected by him.

**10. Homicide § 20— stipulated cause of death — photographs of deceased admissible**

Two photographs of deceased were admissible in this homicide prosecution, even though defendant had stipulated the cause of death, since testimony as to the use of grossly excessive force or the brutal manner of the killing was admissible on the issues of premeditation and deliberation, and the photographs were admissible to illustrate that testimony.

**11. Criminal Law § 89— prior consistent statement — admissibility for corroboration**

It was not prejudicial error for the trial judge to refuse to strike a witness's testimony offered to corroborate the testimony of defendant's mother, though there was a slight variance between the testimonies, since prior consistent statements are admissible to strengthen the witness's credibility, and slight variances between the statements will not render them inadmissible.

Chief Justice SHARP and Justice COPELAND dissenting as to death penalty.

Justice EXUM dissenting.

APPEAL by defendant from *McConnell, J.,* at the 4 February 1974 Criminal Session, FORSYTH Superior Court.

Upon an indictment proper in form, defendant was convicted of murder in the first degree of his daughter, Mae Ruth Patterson (Mae Ruth), and sentenced to death. This case was docketed and argued as No. 31 at the Spring Term 1975.

Mae Ruth was found murdered in the residence of defendant and his mother (Mrs. Patterson) in Winston-Salem, North Carolina, on 14 June 1973 by Mrs. Patterson and a neighbor, Viola Suber. Defendant was charged with the crime and arrested on 14 June 1973. Sergeant D. B. Parker of the Winston-Salem Police Department, on Friday, 15 June 1973, tried to get a statement from him; but after being advised of his rights, defendant refused to make a statement. Sergeant Parker and Sergeant Brown, also of the Winston-Salem Police Department, again questioned defendant on Sunday, 17 June 1973, and obtained a signed confession.

On 26 July 1973, the Forsyth District Court, finding that the court "has cause to believe that the defendant may not be competent to stand trial," ordered defendant committed to

Cherry Hospital, Goldsboro, North Carolina, for observation. There, Dr. E. V. Maynard, Regional Director of Forensic Psychiatry, reported defendant to be "Without Psychosis (Not Insane)" and further reported, in pertinent part, as follows:

> "The examinations, observation and testing performed in his hospital have revealed no evidence of insanity, nor any serious mental disorder which might interfere with this defendant's competency to stand trial. He does, however, suffer from an organic brain syndrome, non-psychotic, (not insane) with epilepsy, brain trauma, and circulatory disturbance. This condition does impair the defendant's ability to control the involuntary movements of his body but in no way should it interfere with his ability to stand trial to the charge of murder.

> "Mr. Patterson has demonstrated to this staff the capacity to comprehend his position and to understand the nature and object of the proceedings against him . . . [and] the capacity to conduct his defense in a rational manner and to cooperate with his counsel to the end that any available defense may be interposed. . . . "

Defendant was discharged on 12 September 1973 and returned to Forsyth County for trial.

On 16 October 1973, defendant's court-appointed counsel, Mr. Mitchell, moved pursuant to G.S. 7A-454 for an order approving a fee to employ a private psychiatrist of defendant's choice for the purpose of further inquiry into defendant's sanity on "June 19 [sic], 1973," and his mental competency to stand trial. Although this motion was denied by Judge Wood on 25 October 1973, a similar motion by defendant was again filed on 15 November 1973. Judge Armstrong, then presiding, after finding "that one of the crucial questions involved in the action is whether the defendant was competent or sane on the day of the alleged crime and whether the defendant is presently competent to stand trial," ordered that defendant be examined by Dr. Richard Proctor, a psychiatrist at the Bowman Gray School of Medicine. Dr. Proctor, in a written report dated 23 November 1973, found defendant did have evidence of "organic brain damage and has had epileptic type seizures in the past," but also found that:

> "There was no evidence of any psychotic thinking. He was controlled and his responses in the main were appropriate except for evasion.

State v. Patterson

\* &ast; &ast;

" . . . [T]his individual is able to understand the charges preferred against him and to participate in his own defense. He is competent and capable . . . of standing trial."

The case was first called for trial before Judge Armstrong on 8 January 1974. During this trial, the State attempted to offer in evidence defendant's signed confession. Judge Armstrong believed that the admissibility of this confession depended upon whether defendant was in fact represented by counsel, a Mr. Braddy, at the time the statement was made and that defendant should have the benefit of the testimony of Braddy on this question. Upon learning that Braddy was confined to a hospital in Elizabethtown, North Carolina, and unable to testify, Judge Armstrong, with defendant's consent, declared a mistrial and remanded defendant to jail.

The case again came on for trial before Judge McConnell on 5 February 1974. Other than defendant's signed confession, the evidence against him was essentially the testimony of Mrs. Patterson and the investigating police officers. Mrs. Patterson's testimony tended to show the following: On 14 June 1973, Mae Ruth appeared in the Forsyth County District Court to prosecute a warrant against defendant alleging that he earlier had assaulted her. Defendant told Mrs. Patterson that he had recently shot a gun through a door to Mrs. Patterson's bedroom which Mae Ruth and a man were occupying at the time. (Her testimony does not make clear whether the shooting or some other incident was the basis for the assault charge.) After court, Mae Ruth returned to the residence and went to the bedroom of defendant. When defendant and Mae Ruth began arguing, Mrs. Patterson left the house. Later, defendant came out of the house and told Mrs. Patterson to "[g]o in there and see about Princess [referring to Mae Ruth]." Mrs. Patterson got her neighbor, Mrs. Suber, to go with her into the house. They found Mae Ruth lying on Mrs. Patterson's bed apparently dead. Winston-Salem police officer T. L. Reavis testified that after being called to the scene and learning what had happened, he searched the neighborhood for defendant and found him about 1:00 p.m. drunk and drinking wine in an alley near his residence.

Defendant's signed confession, admitted into evidence, was reproduced in the record as follows:

"He left court about 10:30 Thursday morning. The judge had sentenced him to eighteen months for protecting his house against Mae Ruth. He had Attorney Braddy appeal the case. He stopped at the AID Drugstore and bought two packs of cigarettes, went to Cherry Street and caught a taxi home. When he paid the taxi driver, his mother was on the front porch worried. She told him Mae Ruth was in the bedroom. He told Mae Ruth to open the door and she told him she was in bed. He told her to open the door and she did. . . . He told her to get out and never come back in so she went and got in bed in her grandmother's bed. He said he was so confused about the lies she told in court that he went in her grandmother's bedroom. Mae Ruth started talking back to him and his mother told them to lower their voices. Mae Ruth was backtalking and cursing him. He told her to leave the house, and she wouldn't. He told her he would give her fifteen minutes to get out. He said he had a watch on and when the fifteen minutes were up, she was still arguing. He took the meat cleaver. He said, 'Just say I killed her.'"

With regard to the meat cleaver, Sergeant Parker testified: "He said he got it out of the kitchen. We never found it. He said he washed it off after killing Mae Ruth, stuck it under his coat and threw it in some vines off of King Street Alley. There are thick weeds and vines that grow five or six feet high in that area."

It was stipulated that the deceased died from "massive blood loss from deep lacerations of the face, neck, and head caused by a sharp, heavy instrument."

Defendant offered no evidence.

*Attorney General Robert Morgan and Assistant Attorney General Ralf F. Haskell, for the State.*

*Eddie C. Mitchell, for defendant appellant.*

MOORE, Justice.

[1] Defendant strenuously urges there was insufficient evidence to carry the case to the jury on the issues of premeditation and deliberation and the trial court erred in not allowing

his motion for a nonsuit on the first degree murder charge. Taking the evidence in the light most favorable to the State, we find sufficient evidence to permit a jury to find premeditation and deliberation. These elements of first degree murder are not usually susceptible to direct proof, but must be established, if at all, from the circumstances surrounding the homicide. *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975); *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487 (1970), *rev'd on other grounds,* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2290 (1971); *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769 (1961), *cert. den.,* 368 U.S. 851, 7 L.Ed. 2d 49, 82 S.Ct. 85 (1961). Previously existing hostile feelings between defendant and deceased, *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652 (1969); a prior assault upon the deceased by defendant, *State v. Gales,* 240 N.C. 319, 82 S.E. 2d 80 (1954); the use of grossly excessive force, *State v. Buchanan, supra;* and killing in an unusually brutal way, *State v. Watson,* 222 N.C. 672, 24 S.E. 2d 540 (1943), have all been held to be circumstances tending to show premeditation and deliberation. There was evidence here of these circumstances and, in addition, evidence of revenge as a probable motive.

Murder in the first degree is the unlawful killing of a human being with malice, premeditation and deliberation. *State v. Moore, supra; State v. Faust, supra.* If defendant resolved in his mind a fixed purpose to kill his daughter and thereafter, because of that previously formed intent and not because of any legal provocation on her part, deliberately and intentionally killed her with a meat cleaver, a deadly weapon, the three essential elements of murder in the first degree—premeditation, deliberation, and malice—occurred. "Malice is not only hatred, ill-will, or spite, as it is ordinarily understood—to be sure that is malice—but it also means that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." *State v. Benson,* 183 N.C. 795, 799, 111 S.E. 869, 871 (1922). Malice exists as a matter of law "whenever there has been an unlawful and intentional homicide without excuse or mitigating circumstance." *State v. Baldwin,* 152 N.C. 822, 829, 68 S.E. 148, 151 (1910).

The record here contains plenary evidence from which the jury could find that defendant, motivated by ill will and express malice toward his daughter because of her prosecution of him in district court, intentionally killed her. All of the following evidence—that he gave her fifteen minutes to leave the house, that

he went into the kitchen and got the meat cleaver, and that at the expiration of fifteen minutes struck her numerous blows so that her head was "partially off. There was a very deep laceration about her neck . . . others under her chin and about her face"—tended to show premeditation and deliberation as well as malice. Hence, defendant's motions for nonsuit were properly overruled.

Defendant next contends it was error to admit into evidence his 17 June confession. Pertinent evidence on this question was as follows:

Sergeant Parker first attempted to question defendant at the Forsyth County Jail on 15 June 1973. He advised defendant fully of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). Before the jury, Sergeant Parker testified that defendant "indicated" that he understood his rights. Parker said:

" . . . After we advised him, he wanted to call his attorney, Mr. Braddy. He talked with someone on the phone and told us he would tell us what we wanted to know, but not then. The next time we attempted to question him was on the seventeenth at the county jail, then at the detective office."

Sergeant Parker and Sergeant Brown at the jail on 17 June 1973 again asked defendant if he wanted to talk. Parker testified:

"He said he wanted to talk to us, so we took him across the street. We again advised him of his Constitutional Rights on June 17, 1973."

In response to a question as to whether in his opinion defendant then understood his rights, Sergeant Parker testified over objection:

"In my opinion, he understood them. He indicated that he did. We did not threaten him. We simply asked him if he wanted to tell us what happened, and he said he did. He said he wanted to call his daughter. He used the phone."

At this point the jury was excused and a *voir dire* hearing conducted to determine the admissibility of the confession. During this hearing Sergeant Parker again testified that in his opinion defendant understood his rights. With regard to the statement itself, Sergeant Parker said:

State v. Patterson

" . . . We wrote it down, read it back to him, had him
read it, and he signed it. He made two corrections; one on
page two adding 'in my room' and on page three adding
'my,' my house, then he signed it. Sergeant Brown and
myself witnessed his signature on each page. When he
corrected it, I read it to him—he read it himself. There
were no promises made or threats made while we took the
statement by anyone."

Sergeant Parker, on cross-examination, admitted that on 17
June defendant "refused to sign the waiver of rights after we
had advised him of his rights. . . . He said he did not want a
lawyer, but wanted to call his daughter. He then made a volun-
tary statement, and didn't ask us to stop at any time." When
asked whether defendant refused to sign the waiver because he
didn't understand it, Sergeant Parker said he would not deny
this but that he did not remember exactly defendant's reason
for refusing. He testified that they read and reread the written
waiver to defendant and "when we asked him did he understand
it, he said, 'Yes.' We asked him to sign it, and he refused."

Sergeant G. D. Brown also testified on *voir dire* that on 17
June 1973 Sergeant Parker advised defendant of all of his
rights as required by *Miranda,* fully detailing them. When asked
on direct examination whether in his opinion defendant under-
stood his rights, Sergeant Brown testified:

"I believe he understood. He didn't want an attorney,
but he wanted to call his daughter. He said he understood
the rights. I was present while Sergeant Parker did the
interrogating and wrote it down. After it was completed,
Sergeant Parker read the statement back to Mr. Patterson,
then Mr. Patterson read it and made a couple of corrections.
Then he signed it. We witnessed his signature. There were
no threats or promises made at any time.

* * *

"The interrogation lasted about an hour. It does not
contain everything that Mr. Patterson said, just the general
basis of it."

During cross-examination the court asked Sergeant Brown,
"Did he say he wanted to go ahead and make a statement?"
Brown replied, "Yes, sir, he did. He made the phone call and
after he did, he sat back down and said he was ready to talk
to us."

Defendant's evidence on *voir dire* was to this effect: Jim Moore, a deputy clerk of court, testified that he was present at defendant's preliminary hearing on 26 July 1973, and that Mr. George Braddy appeared then on behalf of the defendant as his attorney and presented an order to send defendant for a mental examination. Mr. Reginald Moore, official court reporter in Forsyth County, testified that he reported defendant's trial before Judge Armstrong in January 1974. His official record of the trial proceeding indicated that Sergeant D. B. Parker had testified as follows:

"Q. Mr. Patterson didn't sign a waiver of rights, did he?

"A. No, sir. He refused to sign one.

"Q. Isn't the reason he refused to sign it because you refused to give him the attorney he wanted?

"A. No, sir. He said he just wouldn't sign anything.

"Q. He wouldn't sign anything?

"A. Not unless he knew what it was."

Mr. Curtis Todd, an attorney practicing in Winston-Salem, testified that he had represented defendant in the past and that he talked with defendant "shortly after the alleged occurrence by telephone from City Hall or the jail. He wanted me to come down there and talk to him but I told him I could not."

Defendant testified essentially that after being "questioned" about his constitutional rights he did not make a statement because he wanted an attorney present. He asked for lawyer George W. Braddy "but Sergeant Parker said he didn't know him, so I asked for another lawyer." Sergeant Parker wouldn't let him call another one because Parker wanted him to sign the rights waiver. Two or three days later, the officers took him across the street where he then refused to sign the waiver because he didn't have a lawyer present, stating, "I wanted Attorney Braddy present before I signed anything." Braddy had represented him in his assault trial on 14 June and visited him at the jail on 18 June for the purpose of collecting a balance due on Braddy's fee. On Sunday morning, 17 June, Sergeant Parker asked him if he wanted any other lawyer and he replied that he would like to call Curtis Todd who had handled a civil matter for him earlier and whose number he knew.

Sergeant Parker called and talked with Todd, and then allowed defendant to talk with Todd. Defendant testified, "They forced a statement out of me," and that he, in fact, did not sign the statement.

Curtis Todd, being recalled, testified defendant called him twice and one time could have been on a Sunday when defendant was in custody. Todd said, "I know he was in custody because the officer did get me and put him on the phone."

Defendant offered the visitor's log of the Forsyth County Jail which showed that Mr. George W. Braddy, an attorney practicing at 608 O'Hanlon Building, Winston-Salem, visited defendant at 3:15 p.m. on 17 June 1973 and at 10:30 a.m. on 29 June 1973.

It was stipulated that the signed confession was obtained at 11:30 a.m. on 17 June 1973.

Upon this evidence Judge McConnell found, in pertinent part:

(1) On 15 June, when first questioned by Sergeant Parker, defendant asked to call his lawyer, Mr. Braddy, used the telephone, and then stated "he would talk to them later, but did not wish to make any statement at the time."

(2) On 17 June, after being duly advised of his rights pursuant to Miranda, defendant "stated that he did not want an attorney, but would like to talk to his daughter and that he was given the phone and talked to someone . . . and . . . thereafter, he . . . freely and voluntarily made a statement which has been identified by Officers Parker and Brown."

(3) On 17 June, "the defendant said he did not want to sign a waiver of his rights, but did make a statement freely and voluntarily after being advised of his rights and after stating that he did not want an attorney present."

(4) "That the defendant . . . appears to be intelligent, above average intelligence . . . and that he was coherent and appeared to understand what he was saying and, after the statement was written down . . . it was read to him and he himself appeared to read it and made certain corrections. . . . "

Upon these findings, Judge McConnell concluded:

" . . . [T]he statement made by the defendant . . . was made voluntarily, knowingly, and independently and that

the defendant was in full understanding of his Constitutional Rights to remain silent and the rights to counsel and all other rights and, in fact, stated that he did not want a lawyer . . . that he purposely, freely, knowingly, and voluntarily waived each of the rights which had been read to him on several occasions by the two officers and thereupon made a statement to the officers which shall be introduced into evidence over the objection of the defendant."

Judge McConnell's findings are amply supported by competent evidence. His conclusions and determination of admissibility are, likewise, supported by his findings. His ruling, consequently, that the confession is admissible will not be disturbed on appeal notwithstanding that there may be evidence from which a different conclusion could be reached. *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975) ; *State v. McRae,* 276 N.C. 308, 172 S.E. 2d 37 (1970) ; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966), *cert. den.,* 386 U.S. 911, 17 L.Ed. 2d 784, 87 S.Ct. 860 (1967).

Nevertheless, defendant contends, with regard to the confession: first, his refusal to sign a written waiver precluded a finding of waiver; second, it was error to permit the investigating officers to testify as to their "opinion" of defendant's understanding of his rights; third, at least that portion of the confession relating to the district court proceedings resulting in an eighteen months' sentence being imposed upon defendant was inadmissible inasmuch as it tended to show the commission of another criminal act; and fourth, defendant was in fact represented by counsel at the time his confession was taken which, itself, precluded its admissibility.

To support his first contention defendant relies strongly on *United States v. Nielsen,* 392 F. 2d 849 (7th Cir. 1968). In this case the defendant was warned of his rights before questioning by an FBI agent. He read a statement of his rights contained in a waiver form and said, "I am not going to sign this document. I have an attorney . . . and I am not signing anything, including this form, until I have occasion to talk to [the attorney]." The defendant told the agent, however, that questioning could continue. Holding that defendant's negative responses to certain questions then asked him by the agent were not admissible, the Seventh Circuit said:

"Here the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further ques-

State v. Patterson

tioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion." *Id.* at 853.

Thus, defendant argues that his refusal to sign the waiver form makes his confession the product of "ignorance and confusion," inadmissible under the rationale of *Nielsen.*

[2, 3] Refusal to sign a written waiver is a fact which may tend to show that no waiver occurred. It is not conclusive in the face of other evidence tending to show waiver. There is no constitutional requirement that the waiver be in writing. "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." *Miranda v. Arizona, supra,* at 475. Our statute expressly permits oral waiver. G.S. 7A-457 (c). Sergeant Parker testified that defendant said on 15 June that "he would tell us what we wanted to know, but not then." On 17 June, Sergeant Parker testified that defendant replied affirmatively when asked "if he wanted to tell us what happened," and stated then that "[h]e didn't want an attorney, but he wanted to call his daughter." Sergeant Brown testified that after defendant used the telephone on 17 June "he sat back down and said he was ready to talk to us." This is sufficient to constitute an oral waiver.

[4] A refusal to sign a waiver form does not necessarily preclude a valid oral waiver. *State v. Simmons, supra; State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968) ; *United States v. Johnson,* 455 F. 2d 311 (5th Cir. 1972) ; *United States v. Hopkins,* 433 F. 2d 1041 (5th Cir. 1970), *cert. den.,* 401 U.S. 1013, 28 L.Ed. 2d 550, 91 S.Ct. 1252 (1971) ; *United States v. Crisp,* 435 F. 2d 354 (7th Cir. 1970), *cert. den.,* 402 U.S. 947, 29 L.Ed. 2d 116, 91 S.Ct. 1640 (1971) ; *United States v. Thompson,* 417 F. 2d 196 (4th Cir. 1969), *cert. den.,* 396 U.S. 1047, 24 L.Ed. 2d 692, 90 S.Ct. 699 (1970) ; *Hodge v. United States,* 392 F. 2d 552 (5th Cir. 1968). In *Thompson,* the Court of Appeals for the Fourth Circuit said:

". . . In view of Thompson's intelligence, his affirmative statement that he understood the explanation of his

rights, and the voluntariness of his confession, we hold that his refusal to sign a written waiver did not render the confession inadmissible. [Citations omitted.]" *Id.* at 197.

In short, Judge McConnell has found defendant's confession voluntary and his waiver of constitutional rights the product of intelligence and understanding. These findings, supported by competent evidence, are, as we have said, conclusive on appeal.

[5] It was, we believe, error to permit interrogating officers Parker and Brown to testify "in their opinion" defendant understood his rights. Whether defendant understood is a question of fact which is capable of being proved and therefore must be proved if at all by his actual responses, verbal or otherwise, to the explanations given him of his rights. The officers are no better qualified to assess the understanding, or lack thereof, of a defendant than is the trier of fact. Therefore, the general rule prohibiting "opinion" testimony applies. "[O]pinion is inadmissible whenever the witness can relate the facts so that the jury [or trier of fact] will have an adequate understanding of them and . . . is as well qualified as the witness to draw inferences and conclusions from the facts." 1 Stansbury's N. C. Evidence § 124 (Brandis Rev. 1973), and cases cited at n.16. While lay opinion of the mental capacity of another is admissible in many instances, *id.* § 127, "[g]enerally . . . a witness may not give his opinion of another person's *intention* on a particular occasion." *Id.* § 129, and cases cited at n.15. Similarly, we hold that a witness may not give an opinion as to whether a defendant in a criminal case *understood* his rights but must instead detail the facts upon which the opinion rests.

[6] There was, nevertheless, other competent evidence of defendant's understanding. The most telling is that defendant *attempted to exercise* his right to counsel on 15 June and, according to his evidence, again on 17 June. He also *exercised* his right to remain silent on 15 June. Also, Sergeant Brown testified that on 17 June defendant *"said* he understood the rights." (Emphasis added.) The question of defendant's understanding was for the trial court. We must presume the court based its finding on the competent evidence and ignored that which was incompetent. Where the court is the trier of facts, "in the absence of words or conduct indicating otherwise, the presumption is that the judge disregarded incompetent evidence." *City of Statesville v. Bowles,* 278 N.C. 497, 502, 180 S.E. 2d 111, 114-15 (1971). "[T]he court's findings of fact will not be reversed

unless based only on incompetent evidence." *Cogdill v. Highway Comm.* and *Westfeldt v. Highway Comm.*, 279 N.C. 313, 320, 182 S.E. 2d 373, 377 (1971). Beyond a reasonable doubt this error was not prejudicial to defendant.

Defendant further contends that error occurred when the trial court admitted that portion of his confession which states:

> "He left court about 10:30 Thursday morning. The judge had sentenced him to eighteen months for protecting his house against Mae Ruth. He had attorney Braddy appeal the case. . . ."

Defendant's exception to this portion of the confession is not properly supported by a specific objection. "[W]here only a portion of a witness' testimony is incompetent, the party moving to strike should specify the objectionable part and move to strike it alone." *State v. Pope,* 287 N.C. 505, 511, 215 S.E. 2d 139, 144 (1975). *See also* 1 Stansbury's N. C. Evidence § 27 (Brandis Rev. 1973).

[7] Since this is a capital case, we will, nevertheless, consider the contention. *State v. Fowler,* 270 N.C. 468, 155 S.E. 2d 83 (1967) ; *State v. McCoy,* 236 N.C. 121, 71 S.E. 2d 921 (1952). Later in the confession, defendant states that "[h]e was so confused about the lies she told in court that he went in her grandmother's bedroom," where shortly the killing took place. This was evidence from which a jury could find that in defendant's mind he had been sentenced to eighteen months on account of lies told in court by the deceased. "Where evidence tends to prove a motive on the part of the accused to commit the crime charged, it is admissible, even though it discloses the commission of another offense by the accused." *State v. McClain,* 240 N.C. 171, 176, 81 S.E. 2d 364, 367 (1954), citing *State v. Birchfield,* 235 N.C. 410, 70 S.E. 2d 5 (1952). In *Birchfield,* evidence was held to be properly admitted that the victim of the assault being tried had, on a recent occasion, prosecuted the defendant for an earlier assault because "[t]his evidence had a logical tendency to show intent and motive on the part of the defendants." *Id.* at 415, 70 S.E. 2d at 8. There was no error in admitting this portion of the confession.

Defendant next contends that the trial court erred in admitting his confession since it was taken at a time when he was represented by counsel, Mr. Braddy, whose presence he had not waived. Although again the record is not entirely clear, Mr.

Braddy apparently represented defendant on 14 June in district court on the assault charge. On 15 June, defendant requested a chance to call Mr. Braddy. The police officers knew that defendant talked to someone but did not know whether it was Mr. Braddy or whether Mr. Braddy had agreed to represent defendant. According to defendant himself, testifying on *voir dire:* he did not call Mr. Braddy from the county jail but after his confession was made, Mr. Braddy came to see him in jail for the purpose of collecting a balance due on his fee for his representation on the assault charge. There was testimony that Mr. Braddy appeared for the defendant on 26 July 1973 to secure an order to have the defendant sent for a mental examination. Because of the time and nature of this appearance it would have little significance in determining whether Mr. Braddy represented the defendant on 17 June 1973.

[8] Assuming that Mr. Braddy's representation of the defendant on the assault charge continued through 17 June, there was no denial of defendant's right to counsel in the murder case. A defendant may waive the presence of an attorney in a case under investigation when the attorney represents him on an unrelated charge. *United States v. Crook,* 502 F. 2d 1378 (3rd Cir. 1974), *cert. den.,* 419 U.S. 1123, 42 L.Ed. 2d 823, 95 S.Ct. 808 (1975) ; *United States v. Dority,* 487 F. 2d 846 (6th Cir. 1973). *See also People v. Taylor,* 27 N.Y. 2d 327, 266 N.E. 2d 630, 318 N.Y.S. 2d 1 (1971), which held that the New York rule that an accused, after indictment and arraignment, may not be questioned by police on those charges in the absence of counsel, applied only when the police or prosecutor knew that an attorney had been secured to assist the accused *"in defending against the specific charges for which he is held."*

Defendant relies on *United States v. Hedgeman,* 368 F. Supp. 585 (N.D. Ill. 1973). In that case, however, the officers misled the defendant into thinking that making a statement would help him and they also had actual knowledge that defendant was represented by counsel in the very case under investigation. There is no suggestion of clever misleading in this case, and as we have said, nothing in the record would support a finding that defendant was actually represented on the charges under investigation.

Judge McConnell has found upon competent evidence that defendant intelligently waived his right to counsel. Such a finding was not precluded even if defendant was represented

by counsel on a charge unrelated to that under investigation. There is no showing of a denial of defendant's right to counsel under these circumstances.

Defendant next argues that his constitutional rights were violated by the denial of his petition filed pursuant to G.S. 7A-454 for an order approving a fee to employ the services of a psychiatrist of his own choice to assist him in preparing for trial. It is not clear from the record whether in fact his motion was allowed by Judge Armstrong's order of 20 November 1973. It does not affirmatively appear who selected Dr. Proctor. Assuming the trial court and not defendant chose Dr. Proctor, defendant's constitutional rights were not thereby infringed. We are not called upon to address the question of whether an indigent defendant is constitutionally entitled, on a proper showing, to have the State provide him psychiatric assistance in the preparation of his defense. Defendant had that. G.S. 7A-454 provides only that "[t]he court in its discretion, may approve a fee for the service of an expert witness who testifies for an indigent person. . . ." The statute permits but does not compel providing an expert to a criminally accused at State expense.

[9] The question presented then is whether an indigent who has been criminally accused and who has already been provided with two psychiatric experts at State expense, whose findings do not suggest that defendant is or has been legally insane or that he is incompetent to stand trial, and whose competency and standing in their profession have not been challenged, is entitled by reason of constitutional due process or equal protection to have the State furnish him still another psychiatrist selected by him. We have found no case that stretches the constitutional mandates this far and defendant has cited none. A number of decisions uphold the denial of an indigent defendant's request for an additional psychiatric expert of his own selection at state expense when the state has already provided competent psychiatric assistance from either state-designated physicians, *Utsler v. Erickson,* 315 F. Supp. 480 (D.S.D. 1970), *aff'd,* 440 F. 2d 140 (8th Cir. 1971), *cert. den.,* 404 U.S. 956, 30 L.Ed. 2d 272, 92 S.Ct. 319 (1971) ; *McGarty v. O'Brien,* 188 F. 2d 151 (1st Cir. 1951), *cert. den.,* 341 U.S. 928, 95 L.Ed. 1359, 71 S.Ct. 794 (1951) ; *Taylor v. State,* 229 Ga. 536, 192 S.E. 2d 249 (1972) ; *Utsler v. State,* 84 S.D. 360, 171 N.W. 2d 739 (1969) ; *Commonwealth v. Belenski,* 276

Mass. 35, 176 N.E. 501 (1931) ; or physicians practicing privately and selected by the trial court, *Barber v. State*, 248 Ark. 64, 450 S.W. 2d 291 (1970) ; *Commonwealth v. Medeiros*, 354 Mass. 193, 236 N.E. 2d 642 (1968), *cert. den.*, 393 U.S. 1058, 21 L.Ed. 2d 699, 89 S.Ct. 699 (1969) ; *State v. Greenwood*, 197 Kan. 676, 421 P. 2d 24 (1966) ; *People v. Richardson*, 192 Cal. App. 2d 166, 13 Cal. Rptr. 321 (1961). Concerning an indigent's entitlement to expert assistance generally, see "Right of Indigent Defendant in Criminal Case to Aid of State by Appointment of Investigator or Expert." Annot., 34 A.L.R. 3d 1256 (1970).

We do not think defendant has been denied due process.

Neither has defendant here, under the circumstances, been denied equal protection of the law. We held in *State v. Frazier*, 280 N.C. 181, 185 S.E. 2d 652 (1972), *death sentence vacated*, 409 U.S. 1004, 34 L.Ed. 2d 295, 93 S.Ct. 453 (1972), that an indigent defendant while entitled to competent counsel at State expense was "not entitled to have the court appoint counsel of his own choosing." *Id.* at 198, 185 S.E. 2d at 663. If *Frazier* is sound constitutionally, and we believe it is, then *a fortiori*, an indigent defendant on a proper showing of reasonable need is entitled by reason of constitutional equal protection to no more than having the State furnish competent psychiatric assistance.

Defendant, having been psychiatrically examined by a medical expert specializing in psychiatry at Cherry Hospital and by a privately practicing psychiatrist who we assume was selected by the trial court, has been assured an adequate opportunity to present his claims fairly. He has not been denied due process or equal protection by failure of the trial court to provide him without charge an additional psychiatrist of his own choosing. *See Ross v. Moffitt*, 417 U.S. 600, 41 L.Ed. 2d 341, 94 S.Ct. 2437 (1974).

[10] Defendant's next contention is that the court erred in allowing into evidence two photographs of deceased inasmuch as defendant stipulated the cause of death. This contention is without merit. The actual photographs were not made part of defendant's case on appeal. He argues, simply, that where the cause of death is stipulated in a homicide case, photographs of deceased are inadmissible since their only purpose would be to inflame and prejudice the jury. This argument misses the point that in a first degree murder case premeditation and de-

liberation may be proved circumstantially by showing the use of grossly excessive force, *State v. Buchanan, supra,* or by proof of the brutal manner of killing, *State v. Watson, supra.* A mere stipulation as to the cause of death may not necessarily convey to the jury full information as to the actual manner of killing. In such a case it is legitimate and often necessary to use testimony describing in detail the manner of killing, and photographs, properly authenticated, may be offered to illustrate this testimony. Defendant relies on *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889 (1963). The basis for decision there was that "ten gory photographs in color" of the deceased were introduced and each one explained in detail. This seemed to us to be "an excessive use" of photographs in a case where the defense was that an accident occurred when the defendant and deceased began playing with a gun. *Foust* represents an exception to the general rule that photographs of a victim in a criminal case, when properly authenticated, may be offered to illustrate relevant testimony of witnesses even though the scenes portrayed are unpleasant or even gruesome to behold. *State v. Boyd,* 287 N.C. 131, 141, 214 S.E. 2d 14, 20 (1975); *State v. Duncan,* 282 N.C. 412, 418, 193 S.E. 2d 65, 69 (1972); *State v. Atkinson,* 275 N.C. 288, 311, 167 S.E. 2d 241, 255 (1969), *death sentence vacated,* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971). The two photographs in question were properly authenticated by Officer Hicks who testified that they accurately depicted the deceased as he observed her when he arrived at the scene of the killing. They were properly admitted into evidence to illustrate the testimony of the witness.

[11]  By his next assignment of error, defendant contends that the trial court erred in refusing to strike the testimony of State's witness Viola Suber, offered for the purpose of corroborating the testimony of Mrs. Lillian Patterson, when, in fact, Mrs. Suber's testimony did not corroborate that of Mrs. Patterson.

"The admissibility of prior consistent statements of the witness to strengthen his credibility has been challenged by counsel and reaffirmed by the Court in scores of cases. Such evidence is admitted not only to rebut the implications arising from testimony as to prior inconsistent statements, but also where the witness's veracity has been impugned in any way." 1 Stansbury's N. C. Evidence § 51, pp. 146-47 (Brandis Rev. 1973), and cases cited therein. *See* Section 52, *id.,* and cases

therein cited for criticism of the North Carolina rule and the reasons for it. In *Lorbacher v. Talley*, 256 N.C. 258, 123 S.E. 2d 477 (1962), Justice Bobbitt, later C.J., quoted with approval:

> "As stated by *Smith, C.J.*, in *Jones v. Jones*, 80 N.C. 246, 250: 'In whatever way the credit of the witness may be impaired, it may be restored or strengthened by this [proof of prior consistent statements] or any other proper evidence tending to insure confidence in his veracity and in the truthfulness of his testimony.' *Bowman v. Blankenship*, 165 N.C. 519, 81 S.E. 2d 746; *Brown v. Loftis*, 226 N.C. 762, 764, 40 S.E. 2d 421; Stansbury, *op. cit.* § 50. . . ."

*See Gibson v. Whitton*, 239 N.C. 11, 79 S.E. 2d 196 (1953). Such previously consistent statements, however, are admissible only when they are in fact consistent with the witness's testimony. *State v. Bagley*, 229 N.C. 723, 51 S.E. 2d 298 (1949); *State v. Melvin*, 194 N.C. 394, 139 S.E. 762 (1927); 1 Stansbury's N. C. Evidence § 52, pp. 150-51 (Brandis Rev. 1973).

If the previous statements offered in corroboration are generally consistent with the witness's testimony, slight variations between them will not render the statements inadmissible. Such variations affect only the credibility of the evidence which is always for the jury. *State v. Bryant*, 282 N.C. 92, 191 S.E. 2d 745 (1972); *State v. Norris*, 264 N.C. 470, 141 S.E. 2d 869 (1965); *State v. Case*, 253 N.C. 130, 116 S.E. 2d 429 (1960).

Applying these principles to the evidence in this case, we hold that it was not prejudicial error for the trial judge to refuse to strike Mrs. Suber's testimony offered to corroborate the testimony of Mrs. Patterson. Mrs. Suber's testimony, in the context of all the evidence, was not inconsistent with and not contradictory to the testimony of Mrs. Patterson. At most there was a slight variance which, when considered with all the evidence, could not possibly have prejudiced defendant. Mrs. Patterson testified, in summary, as follows: She, the deceased, and defendant were in her and defendant's residence on the morning of the killing when defendant and deceased began arguing. This argument was apparently a continuation of some previously existing controversy between deceased and defendant, which ended when deceased successfully prosecuted defendant that very morning in Forsyth District Court for an earlier assault upon her. While Mrs. Patterson was equivocal when asked if anyone else was in the house, she stated, "I

couldn't tell who was in there because I couldn't swear because I didn't look under the bed." However, she never identified anyone else as being there. The clear import of her testimony was that no one else was present. She warned deceased and defendant that if they did not stop arguing she would leave. When the argument continued, she did leave the house. She then testified, "I wasn't out there no time." When defendant came out of the house she asked him, "What you done to Mae Ruth?" and he said, "Go in there and see about her, Mama." This testimony indicates that whatever had been done to Mae Ruth, defendant had done it. Consequently, Mrs. Suber's testimony that Mrs. Patterson told her that "George had told her to go in and see about her granddaughter; that he had hurt her, she was either hurt or dead," was not materially different in import from that of Mrs. Patterson.

Defendant never took the position at trial that he was not his daughter's assailant. On *voir dire* he simply said that he did not sign the confession and that it was forced out of him. He never, even on *voir dire,* denied the truth of it. All the testimony pointed unerringly to defendant as the killer. This assignment is overruled.

This Court on an appeal in a criminal action only reviews matters of law of legal inference, it not being the function of this Court to pass upon the credibility of witnesses or to weigh their testimony. North Carolina Constitution, Article IV, Section 12(1); *State v. Hanes,* 268 N.C. 335, 150 S.E. 2d 489 (1966); *State v. Neill,* 244 N.C. 252, 93 S.E. 2d 155 (1956). The verdict in this case is fully supported by the evidence. However, since the record discloses that the trial judge agreed to accept a plea of guilty of manslaughter, which defendant refused to enter, we commend the case to the Parole Commission for consideration of a recommendation for executive clemency.

An examination of the entire record discloses no error in law sufficient to constitute a basis for awarding a new trial.

No error.

Chief Justice SHARP dissenting as to the death penalty:

The murder for which defendant was convicted occurred on 14 June 1973, a date between 18 January 1973, the day of the

decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated by Chief Justice Bobbitt in his dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974)—an opinion in which Justice Higgins and I joined—, I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissenting opinion of Chief Justice Bobbitt, and my concurrence therein, in *State v. Waddell, supra* at 453 and 476, 194 S.E. 2d at 30 and 47.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissenting:

I concur in the majority's resolution of every issue addressed so ably in the opinion by Justice Moore. There is, however, a fundamental error in the trial judge's instructions to the jury, not addressed by the majority and not excepted to or assigned as error by the defendant, which, nevertheless, in my opinion, goes to the heart of this case and because of which I vote for a new trial. Since this is a capital case and the error as I perceive it highly prejudicial we should, under our long standing rule, take it up *sua sponte. State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975); *State v. Fowler,* 270 N.C. 468, 155 S.E. 2d 83 (1967); *State v. McCoy,* 236 N.C. 121, 71 S.E. 2d 921 (1952).

While the majority correctly concludes there was sufficient evidence for the jury to find premeditation and deliberation, there is also evidence from which the jury could find the intent to kill, even if formed sometime before the act of killing and therefore premeditated, was not deliberated but was instead provoked by the deceased's refusal to leave the house as defendant ordered her to do, her incessant arguing, "talking back" to and cursing defendant. Indeed, this seems to be the essence of the contest at trial.

The only evidence of the manner of the killing and the events which immediately preceded it comes from the defend-

State v. Patterson

ant's pre-trial confession offered by the State against him at trial. This confession, it seems clear to me, is susceptible to two interpretations, either of which could have been reasonably adopted by the jury. One is that when defendant told deceased that "he would give her fifteen minutes to get out" of the house, he *at that time* determined that he would kill her if she didn't, got the meat cleaver from the kitchen, and deliberated the killing while he waited for the fifteen minutes to elapse. When deceased thereafter refused to leave he executed his previously formed and deliberated intent by killing her with the meat cleaver. Under this interpretation of his confession all of the elements of first degree murder are amply satisfied. It can also reasonably be inferred from his confession that defendant had no intent to kill the deceased when he demanded that she leave the house in fifteen minutes but that this intent was formed suddenly at the conclusion of the fifteen minute period and was provoked by deceased's fifteen minutes of argument and "back talking and cursing." The defendant could then have gotten the meat cleaver and killed the deceased in a fit of rage. Thus the crucial question for the jury in this case was whether defendant did indeed deliberate, as distinguished from premeditate, the killing or did he form the intent to kill during a sudden passion provoked by the deceased herself which precluded any such deliberation.

Regarding the element of deliberation the trial judge told the jury only that "the State must satisfy you . . . beyond a reasonable doubt . . . that the defendant acted with deliberation *which means that he acted while he was in a cool state of mind.*" (Emphasis supplied.) This bare bones definition of deliberation in the context of the evidence in this case was not sufficient. General Statute 1-180 requires the trial judge to "declare and explain the law arising on the evidence. . . ." How much the law needs to be explained depends on what evidence is presented. *State v. Cole,* 270 N.C. 382, 154 S.E. 2d 506 (1967). Merely to define an element of a criminal offense may be an insufficiency which prejudices the defendant when that element is the very nub of the case. *State v. Lawrence,* 262 N.C. 162, 136 S.E. 2d 595 (1964) ; *State v. Lunsford and Sawyer,* 229 N.C. 229, 49 S.E. 2d 410 (1948). *See also State v. Thomas,* 118 N.C. 1113, 24 S.E. 431 (1896). Premeditation is a comparatively easy concept for the jury meaning simply some thought beforehand. Deliberation, however, in the context of this case, needs more careful elucidation.

Prior to 1893 there were no degrees of murder in North Carolina. In 1893 murder was divided into two degrees: first degree murder, punishable by death, consisted only of murder committed in the perpetration of another felony and murder which was premeditated and deliberated. All other murder was murder in the second degree. N. C. Pub. Laws 1893, ch. 85; *State v. Benton,* 276 N.C. 641, 657, 174 S.E. 2d 793, 803, 804 (1970). In the very first case construing the new murder statute, *State v. Fuller,* 114 N.C. 885, 902, 19 S.E. 797, 802 (1894), this Court said:

> The theory upon which this change has been made is that the law will always be executed more faithfully when it is in accord with an enlightened idea of justice. Public sentiment has revolted at the thought of placing on a level in the courts *one who is provoked by insulting words* (not deemed by the common law as any provocation whatever) to kill another with a deadly weapon, with him who waylays and shoots another in order to rob him of his money, or poisons him to gratify an old grudge. (Emphasis supplied.)

Two years later in *State v. Thomas, supra,* the issue raised in the case now before us was squarely presented. In *Thomas,* defendant was convicted of first degree murder of his wife and sentenced to death. Testimony tended to show that he and his wife were in a fishing boat near Mason's Point on Bay River in Pamlico County. Witnesses heard screaming and sounds like a beating from the direction of the boat. They also heard defendant say, "If you don't hush I will take something and kill you" after which a "heavy lick" was heard. One witness saw defendant strike his wife and throw her overboard. Defendant returned in the boat alone. The next day her dead body was removed from the water in the area where she and her husband had been. A physician who did the post-mortem examination testified that she died of a broken neck, that she could not have drowned, and that she was dead before she went into the water. This Court held that it was error entitling defendant to a new trial for the trial judge to have charged the jury "in such a way as might well have produced the impression on their minds that they must convict of either murder [in the first degree] or manslaughter," *Id.* at 1124, 24 S.E. at 434, and "in omitting to explain to the jury the application of the testimony to the

theory of murder in the second degree. . . ." *Id.* at 1127, 24 S.E. at 436. This Court said, *Id.* at 1124, 24 S.E. at 435:

> If [the jury] concluded that there was a quarrel or argument, and in the heat of sudden passion, engendered by disagreeable language, which would not have been provocation sufficient to bring the offense within the definition of manslaughter, the crime . . . was murder in the second degree.

In reaching this conclusion this Court analyzed the reason for the division of murder into two degrees and said, 118 N.C. at 1122, 24 S.E. at 434:

> The innate sense of justice implanted in the breast of every good man demanded that *a distinction should be drawn between cases where there was actual though not legal provocation and those where a fixed purpose was shown,* whether from malignity or a mercenary desire for money. (Emphasis supplied.)

Thus *Thomas* added flesh to the concepts of premeditation and deliberation by pointing to the kind of provocation that might negate them.

Nine years later in *State v. Exum,* 138 N.C. 599, 617-18, 50 S.E. 283, 289 (1905) the two terms were separately analyzed:

> The two terms, "deliberate" and "premeditate," while frequently used in this connection as interchangeable, because perhaps the facts do not always require that they should be spoken of separately, have not exactly the same meaning. "Premeditate" involves the idea of prior consideration, while "deliberation" rather indicates *reflection, a weighing of the consequences of the act in more or less calmness.* (Emphasis supplied.)

Although the trial judge explained the meaning only of premeditation, this Court found no error in *Exum* since in his definition of premeditation, he included concepts applicable to deliberation and specifically excluded "all idea of a killing from passion suddenly aroused," and directed the jury that before it could convict of a higher crime it must find that the killing was *"from a fixed determination previously formed after weighing the matter." Id.* (Emphasis supplied.)

Two years later this Court retreated slightly from its position in *Thomas* that any actual provocation could preclude deliberation. *State v. McDowell*, 145 N.C. 563, 59 S.E. 690 (1907). In *McDowell* an argument was provoked by defendant's companion with a train flagman. Defendant, sympathizing with his companion, prepared to do his part and readied his pistol. The Court characterized the fancied wrong to defendant as trivial in nature and refused to hold that if the defendant killed in revenge for the treatment his companion was receiving, it would only be murder in the second degree.

Two subsequent cases applied the *McDowell* limitation on provocation to situations where, objectively, the deceased did nothing to provoke the defendant to anger but instead tried to placate him. *State v. Coffey*, 174 N.C. 814, 94 S.E. 416 (1917); *State v. Benson*, 183 N.C. 795, 111 S.E. 869 (1922). In *Benson* prior definitions of deliberations were expanded, 183 N.C. at 798, 111 S.E. at 871:

> Deliberation means that the act is done in a cool state of the blood. It does not mean brooding over it or reflecting upon it for a week, a day, or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation. *S. v. Coffey*, 174 N.C. 814.

Although this definition of deliberation has been subsequently quoted by this Court many times, portions of it are only dictum in *Benson* and seem to me defective in two respects. First, the issue is not whether the intention to kill was *executed* while in a cool state of blood. To be sure a killing so executed has undoubtedly been deliberated. However, "[i]f the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect." 40 C.J.S. Homicide § 33(d) (1944). See *State v. Britt*, 285 N.C. 256, 262, 204 S.E. 2d 817, 822 (1974). The true test is whether the intent to kill was at any time *considered*, or formed, in a cool, or deliberative, state of mind. Second, the provocation need not be "legal" nor the passion aroused by some "lawful or just cause." "Legal" provocation is what is required to reduce murder to manslaughter

and a lawful or just cause for the killing would require an acquittal. The holding of *Thomas, Benson* and *Coffey* is that any actual provocation can preclude deliberation and reduce the crime to second degree murder provided it is more than trivial and directed toward defendant himself. I can find no case which holds to the contrary. That the true test of whether deliberation exists was not really changed by *Benson* is shown by *State v. Evans,* 198 N.C. 82, 85, 150 S.E. 678, 680 (1929) where this Court said, "The test is involved in the question whether the accused acted under the influence of ungovernable passion, or whether there was evidence of the exercise of reason and judgment."

In *State v. French,* 225 N.C. 276, 34 S.E. 2d 157 (1945), this Court split on the meaning of the prior cases on deliberation. In *French* the killing occurred during an argument between the defendant and the deceased. Both majority and dissenting opinions agreed that the trial judge (Judge Bobbitt, later Chief Justice of this Court) was required to explain deliberation as distinguished from premeditation. Judge Bobbitt's instructions under consideration were:

> [T]he Court charges you that if the State has satisfied you from the evidence beyond a reasonable doubt that the defendant unlawfully killed Duck LeGrand with malice, and has further satisfied you from the evidence beyond a reasonable doubt that prior to the time the defendant inflicted upon Duck LeGrand the fatal wound, the defendant had formed a fixed purpose in his mind to kill her, and that, pursuant to that purpose he did kill Duck LeGrand because of the purpose in his mind, and not because of any legal provocation given him, then the Court charges you that if the State has so satisfied you from the evidence beyond a reasonable doubt, the defendant would be guilty of murder in the first degree, and it would be your duty to so find.

The majority approved these instructions and said they compared favorably to those approved in *State v. McClure,* 166 N.C. 321, 81 S.E. 458 (1914), which the Court quoted as follows:

> "Deliberation means to think about, to revolve over in one's mind; and if a person thinks about the performance of an act and determines in his mind to do that act, he had deliberated upon the act, gentlemen. Premeditation means

to think beforehand, think over a matter beforehand; and where a person forms a purpose to kill another, and weighs this purpose in his mind long enough to form a fixed design to kill at a subsequent time, no matter how soon or how late, and pursuant to said fixed design kills said person, this would be a killing with premeditation and deliberation, and would be murder in the first degree. And the court charges you if you should find beyond a reasonable doubt, gentlemen, that prior to the time he killed the deceased he formed the fixed purpose in his mind to kill him, and that pursuant to that purpose he did kill the deceased because of the purpose in his mind, and not because of any legal provocation that was given by the deceased, then the court charges you that the prisoner would be guilty of murder in the first degree, and it would be your duty to so find."

Stacy, C.J., dissenting, was of the opinion that the instructions did not adequately deal with the concept of deliberation. He said:

This charge as applied to the facts of the instant record fails to draw any distinction between a fixed purpose "deliberately formed" and one engendered from passion suddenly aroused. *S. v. Thomas,* 118 N.C., 1113, 24 S.E., 431; *S. v. Walker,* 173 N.C., 780, 92 S.E., 327. It sufficiently defines premeditation, but makes no reference to deliberation. *S. v. Fuller,* 114 N.C., 885, 19 S.E., 797. "Premeditation" imports prior consideration, "thought of beforehand," while "deliberation" signifies reflection, "in a cool state of blood." *S. v. Exum,* 138 N.C., 601, 50 S.E., 283; *S. v. Evans,* 198 N.C., 82, 150 S.E., 678. It may not be necessary in every case to refer to the two terms separately, but both ideas are essential to a complete definition of the capital offense. *S. v. Exum, supra; S. v. Spivey,* 132 N.C., 989, 43 S.E., 475.

Four years after *French* was decided the legislature added the proviso to our murder statute (and all other capital crimes statutes) permitting juries in their discretion to fix the punishment at life imprisonment for first degree murder. N. C. Sess. Laws 1949, ch. 299, §§ 1-4. This proviso remained in effect until this Court in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973) held that the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238 (1972)

required that the proviso be nullified. After 1949 until our post-*Waddell* decision in *State v. Watson, infra,* my research reveals no significant discussion by this Court of the element of deliberation as distinguished from premeditation in first degree murder cases. Undoubtedly the ability of the jury in such cases to fix the punishment at life imprisonment reduced the significance of careful distinction between first and second degree murder in most cases. Since *Waddell,* however, first degree murder in North Carolina has been punishable only by death. Since the ratification on April 8, 1974, of Section 1, Chapter 1201 of the 1973 Session Laws, codified as N. C. Gen. Stat. 14-17 (1974 Cum. Supp.), murder in the second degree has been punishable by a maximum of life imprisonment.

Punishment for murder in North Carolina is now nearly the same as it was before 1949, first degree murder being punishable only by death and second degree murder by a term of years up to life imprisonment. (Prior to April 8, 1974, second degree murder was punishable by a maximum of thirty years imprisonment. N. C. Gen. Stat. 14-17 (1969)). Consequently the maintenance of a clear distinction between the two crimes has returned to its pre-1949 significance. Since *Waddell,* moreover, this Court has intimated that it would closely scrutinize the principal distinguishing feature—deliberation—both in terms of whether the evidence was sufficient to support a jury finding of its existence, *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975), and whether the concept was properly explained to the jury. *State v. Watson,* 287 N.C. 147, 214 S.E. 2d 85 (1975). *State v. Thomas, supra,* was, in fact, quoted and analyzed at length in *Buchanan* and characterized as placing a "sound interpretation . . . upon the Act of 1893." 287 N.C. at 418, 215 S.E. 2d at 86.

This case presents a close question as to the degree of defendant's culpability. The jury might well have returned a verdict of second degree murder had it been fully and properly instructed on the concept of deliberation and told specifically that if defendant's intent to kill was formed and executed during a passion suddenly aroused by the deceased's verbal abuse and not thereby deliberated he could not be convicted of first degree murder. I believe it was prejudicial error for the trial judge to fail first, to give a definition of deliberation which included this principle and second, to apply the principle to the facts in the case. I vote for a new trial.